# MASSACHUSETTS BOARD OF RETIREMENT ET AL. *v.* MURGIA

No. 74–1044.  Argued December 10, 1975—Decided June 25, 1976

*Terence P. O'Malley,* Assistant Attorney General of Massachusetts, argued the cause for appellants.  With

him on the brief were *Francis X. Bellotti,* Attorney General, and *S. Stephen Rosenfeld* and *Margot Botsford,* Assistant Attorneys General.

*Robert D. City* argued the cause and filed a brief for appellee.[*]

PER CURIAM.

This case presents the question whether the provision of Mass. Gen. Laws Ann. c. 32, § 26 (3)(a) (1966), that a uniformed state police officer "shall be retired . . . upon his attaining age fifty," denies appellee police officer equal protection of the laws in violation of the Fourteenth Amendment.[1]

---

[*]*Henry Friedman* filed a brief for the State Police Association of Massachusetts as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *James A. Lanigan, Alfred Miller,* and *Stephen L. Solomon* for the American Association of Retired Persons et al.; by *Howard Eglit, Jonathan A. Weiss,* and *Melvin Wulf* for Legal Services for the Elderly Poor et al.; by *Thomas K. Gilhool* and *Edwin D. Wolf* for the Older and Middle Age Worker Ombudsman Pilot Project of United Communities of Southeastern Philadelphia et al.; by *James J. McNamara* for the American Medical Association; and by *Melvin S. Louison* for Lieutenant Lawrence Carter et al.

[1] Uniformed state police officers are appointed under Mass. Gen. Laws Ann. c. 22, § 9A (Supp. 1976–1977), which provides:

"Whenever the governor shall deem it necessary to provide more effectively for the protection of persons and property and for the maintenance of law and order in the commonwealth, he may authorize the commissioner to make additional appointments to the division of state police, together with such other employees as the governor may deem necessary for the proper administration thereof. . . . Said additional officers shall have and exercise within the commonwealth all the powers of constables, except the service of civil process, and of police officers and watchmen. . . . No person who has not reached his nineteenth birthday nor any person who has passed his thirtieth birthday shall be enlisted for the first time as an officer of the division of state police, except that said maximum age qualifica-

Appellee Robert Murgia was an officer in the Uniformed Branch of the Massachusetts State Police. The Massachusetts Board of Retirement retired him upon his 50th birthday. Appellee brought this civil action in the United States District Court for the District of Massachusetts, alleging that the operation of § 26 (3) (a) denied him equal protection of the laws and requesting the convening of a three-judge court under

---

tion shall not apply in the case of the enlistment of any woman as such an officer."

In pertinent part c. 32, § 26 (3), provides:

"(a) . . . Any . . . officer appointed under section nine A of chapter twenty-two . . . who has performed service in the division of state police in the department of public safety for not less than twenty years, shall be retired by the state board of retirement upon his attaining age fifty or upon the expiration of such twenty years, whichever last occurs."

"(b) Any . . . officer . . . who has performed service . . . for not less than twenty years and who has not attained . . . age fifty in the case of an officer appointed under the said section nine A, shall be retired by the state board of retirement in case the rating board, after an examination of such officer or inspector by a registered physician appointed by it, shall report in writing to the state board of retirement that he is physically or mentally incapacitated for the performance of duty and that such incapacity is likely to be permanent."

Since § 9A requires that new enlistees in the Uniformed Branch be no more than 30 years of age, few retirements are delayed past 50 until the expiration of 20 years' service.

The question presented in this case was summarily treated in *Cannon* v. *Guste,* 423 U. S. 918 (1975), aff'g No. 74–3211 (May 6, 1975, ED La.); *Weisbrod* v. *Lynn,* 420 U. S. 940 (1975), aff'g 383 F. Supp. 933 (DC 1974); *McIlvaine* v. *Pennsylvania,* 415 U. S. 986 (1974), dismissing appeal from 454 Pa. 129, 309 A. 2d 801 (1973). Our cursory consideration in those cases does not, of course, foreclose this opportunity to consider more fully that question. See, *e. g., Edelman* v. *Jordan,* 415 U. S. 651, 670–671 (1974).

28 U. S. C. §§ 2281, 2284.[2] The District Judge dismissed appellee's complaint on the ground that the complaint did not allege a substantial constitutional question. 345 F. Supp. 1140 (1972). On appeal, the United States Court of Appeals for the First Circuit, in an unreported memorandum, set aside the District Court judgment and remanded the case with direction to convene a three-judge court. Upon a record consisting of depositions, affidavits, and other documentary material submitted by the parties, the three-judge court filed an opinion that declared § 26 (3)(a) unconstitutional on the ground that "a classification based on age 50 alone lacks a rational basis in furthering any substantial state interest," and enjoined enforcement of the statute. 376 F. Supp. 753, 754 (1974). We noted probable jurisdiction, 421 U. S. 974 (1975), and now reverse.

The primary function of the Uniformed Branch of the Massachusetts State Police is to protect persons and property and maintain law and order. Specifically, uniformed officers participate in controlling prison and civil disorders, respond to emergencies and natural disasters, patrol highways in marked cruisers, investigate crime, apprehend criminal suspects, and provide backup support for local law enforcement personnel. As the District Court observed, "service in this branch is, or can be, arduous." 376 F. Supp., at 754. "[H]igh versatility is required, with few, if any, backwaters available for the partially superannuated." Ibid. Thus, "even [appellee's] experts concede that there is a general relationship be-

---

[2] Jurisdiction was invoked pursuant to 28 U. S. C. § 1343, and declaratory and injunctive relief was sought under 28 U. S. C. §§ 2201, 2202. The equal protection denial was alleged to constitute a violation of 42 U. S. C. § 1983. Appellee made no claim under the Federal Age Discrimination in Employment Act of 1967, 81 Stat. 602, 29 U. S. C. § 621 et seq.

tween advancing age and decreasing physical ability to respond to the demands of the job." *Id.*, at 755.

These considerations prompt the requirement that uniformed state officers pass a comprehensive physical examination biennially until age 40. After that, until mandatory retirement at age 50, uniformed officers must pass annually a more rigorous examination, including an electrocardiogram and tests for gastro-intestinal bleeding. Appellee Murgia had passed such an examination four months before he was retired, and there is no dispute that, when he retired, his excellent physical and mental health still rendered him capable of performing the duties of a uniformed officer.

The record includes the testimony of three physicians: that of the State Police Surgeon, who testified to the physiological and psychological demands involved in the performance of uniformed police functions; that of an associate professor of medicine, who testified generally to the relationship between aging and the ability to perform under stress; and that of a surgeon, who also testified to aging and the ability safely to perform police functions. The testimony clearly established that the risk of physical failure, particularly in the cardiovascular system, increases with age, and that the number of individuals in a given age group incapable of performing stress functions increases with the age of the group. App. 77–78, 174–176. The testimony also recognized that particular individuals over 50 could be capable of safely performing the functions of uniformed officers. The associate professor of medicine, who was a witness for the appellee, further testified that evaluating the risk of cardiovascular failure in a given individual would require a number of detailed studies. *Id.*, at 77–78.

In assessing appellee's equal protection claim, the District Court found it unnecessary to apply a strict-scrutiny test, see *Shapiro* v. *Thompson*, 394 U. S. 618 (1969), for

it determined that the age classification established by the Massachusetts statutory scheme could not in any event withstand a test of rationality, see *Dandridge* v. *Williams,* 397 U. S. 471 (1970). Since there had been no showing that reaching age 50 forecasts even "imminent change" in an officer's physical condition, the District Court held that compulsory retirement at age 50 was irrational under a scheme that assessed the capabilities of officers individually by means of comprehensive annual physical examinations. We agree that rationality is the proper standard by which to test whether compulsory retirement at age 50 violates equal protection. We disagree, however, with the District Court's determination that the age 50 classification is not rationally related to furthering a legitimate state interest.

I

We need state only briefly our reasons for agreeing that strict scrutiny is not the proper test for determining whether the mandatory retirement provision denies appellee equal protection. *San Antonio School District* v. *Rodriguez,* 411 U. S. 1, 16 (1973), reaffirmed that equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right[3] or operates to the peculiar disadvantage of a suspect class.[4] Mandatory retirement at age 50

---

[3] *E. g., Roe* v. *Wade,* 410 U. S. 113 (1973) (right of a uniquely private nature); *Bullock* v. *Carter,* 405 U. S. 134 (1972) (right to vote); *Shapiro* v. *Thompson,* 394 U. S. 618 (1969) (right of interstate travel); *Williams* v. *Rhodes,* 393 U. S. 23 (1968) (rights guaranteed by the First Amendment); *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535 (1942) (right to procreate).

[4] *E. g., Graham* v. *Richardson,* 403 U. S. 365 (1971) (alienage); *McLaughlin* v. *Florida,* 379 U. S. 184 (1964) (race); *Oyama* v. *California,* 332 U. S. 633 (1948) (ancestry).

under the Massachusetts statute involves neither situation.

This Court's decisions give no support to the proposition that a right of governmental employment *per se* is fundamental. See *San Antonio School District* v. *Rodriguez, supra; Lindsey* v. *Normet,* 405 U. S. 56, 73 (1972); *Dandridge* v. *Williams, supra,* at 485. Accordingly, we have expressly stated that a standard less than strict scrutiny "has consistently been applied to state legislation restricting the availability of employment opportunities." *Ibid.*

Nor does the class of uniformed state police officers over 50 constitute a suspect class for purposes of equal protection analysis. *Rodriguez, supra,* at 28, observed that a suspect class is one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." While the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike, say, those who have been discriminated against on the basis of race or national origin, have not experienced a "history of purposeful unequal treatment" or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities. The class subject to the compulsory retirement feature of the Massachusetts statute consists of uniformed state police officers over the age of 50. It cannot be said to discriminate only against the elderly. Rather, it draws the line at a certain age in middle life. But even old age does not define a "discrete and insular" group, *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152–153, n. 4 (1938), in need of "extraordinary protection from the majoritarian political process." Instead, it marks a stage that each of us will reach if we live out

our normal span. Even if the statute could be said to impose a penalty upon a class defined as the aged, it would not impose a distinction sufficiently akin to those classifications that we have found suspect to call for strict judicial scrutiny.

Under the circumstances, it is unnecessary to subject the State's resolution of competing interests in this case to the degree of critical examination that our cases under the Equal Protection Clause recently have characterized as "strict judicial scrutiny."

## II

We turn then to examine this state classification under the rational-basis standard. This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary. *Dandridge* v. *Williams, supra,* at 485. Such action by a legislature is presumed to be valid.[5]

In this case, the Massachusetts statute clearly meets the requirements of the Equal Protection Clause, for the State's classification rationally furthers the purpose identified by the State:[6] Through mandatory retirement at age 50, the legislature seeks to protect the public by assuring physical preparedness of its uniformed police.[7]

---

[5] See, *e. g., San Antonio School District* v. *Rodriguez,* 411 U. S. 1, 40–41 (1973); *Madden* v. *Kentucky,* 309 U. S. 83, 88 (1940); *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78–79 (1911).

[6] See *San Antonio School District* v. *Rodriguez, supra,* at 17.

[7] A special legislative commission's report preceding the enactment of the age-50 maximum for uniformed police stated: "The Division of State Police, by virtue of the nature of the work demanded of its members, undoubtedly requires comparatively young men of vigorous physique. The nature of the duties to be performed in all weathers is arduous in the extreme . . . . No argument is

Since physical ability generally declines with age, mandatory retirement at 50 serves to remove from police service those whose fitness for uniformed work presumptively has diminished with age. This clearly is rationally related to the State's objective.[8] There is no indication

---

needed to demonstrate that men above middle life are not usually physically able to perform such duties." Mass. H. Doc. No. 1582, p. 8 (1938). With these considerations in mind, the State's Commissioner of Public Safety argued before the commission for provisions permitting retirement of state police at 45. The commission observed in response that it was "not prepared to say that the contention of the Commissioner of Public Safety, that [state police] over age forty-five should be eligible [for] retirement, is unsound as a matter of public policy." *Ibid.* The commission, however, deferred the problem of setting retirement ages for the state police to special study, their sole reason for not recommending age 45 being the anticipated pension costs to the State, not the reasonableness of the age with respect to job qualification. *Id.,* at 7–9. Though the age-50 limitation was not specifically proposed by the commission, but was ultimately enacted by the legislature after further study, Act of Aug. 12, 1939, c. 503, § 3 (1939), Mass. Acts & Resolves 737–738 (1939), it is apparent that the purpose of the limitation was to protect the public by assuring the ability of state police to respond to the demands of their jobs. See also Mass. H. Doc. No. 5316, pp. 16–17 (1967); Mass. H. Doc. No. 2500, pp. 21, 23–25 (1955). This purpose is also clearly implied by the State's maximum-age scheme, which sets higher mandatory retirement ages for less demanding jobs. See Mass. Gen. Laws Ann. c. 32, §§ 1, 3 (2)(g), 26 (3)(a) (1966 and Supp. 1975).

[8] Appellee seems to have suggested in oral argument that Mass. Gen. Laws Ann. c. 32, §§ 1, 3 (2)(g), 26 (3)(a), also deny equal protection through the job classification established by them. Tr. of Oral Arg. 14, 17–18. Any such argument, however, is unpersuasive. The sections do set a maximum retirement age for uniformed state officers which is less than that set for other law enforcement personnel. It has never been seriously disputed, if at all, however, that the work of uniformed state officers is more demanding than that of other state, or even municipal, law enforcement personnel. It is this difference in work demands that underlies the job classification. Mass. H. Doc. No. 2500, pp. 21–22 (1955).

that § 26 (3) (a) has the effect of excluding from service so few officers who are in fact unqualified as to render age 50 a criterion wholly unrelated to the objective of the statute.[9]

That the State chooses not to determine fitness more precisely through individualized testing after age 50 is not to say that the objective of assuring physical fitness is not rationally furthered by a maximum-age limitation. It is only to say that with regard to the interest of all concerned, the State perhaps has not chosen the best means to accomplish this purpose.[10] But where rationality is the test, a State "does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect." *Dandridge* v. *Williams*, 397 U. S., at 485.

We do not make light of the substantial economic and psychological effects premature and compulsory retirement can have on an individual; nor do we denigrate the ability of elderly citizens to continue to contribute to society. The problems of retirement have been well doc-

---

[9] Review of Massachusetts' maximum-age limitations by state legislative commissions has proceeded on the principle that "maximum retirement age for any group of employees should be that age at which the efficiency of a large majority of the employees in the group is such that it is in the public interest that they retire." *Id.*, at 7.

[10] Indeed, were it not for the existing annual individual examinations through age 50, appellee would concede the rationality of mandatory retirement at 50. Tr. of Oral Arg. 22–23. The introduction of individual examinations, however, hardly defeats the rationality of the State's scheme. In fact, it augments rationality since the legislative judgment to avoid the risk posed by even the healthiest 50-year-old officers would be implemented by annual individual examinations between ages 40 and 50 which serve to eliminate those younger officers who are not at least as healthy as the best 50-year-old officers.

umented and are beyond serious dispute.[11] But "[w]e do not decide today that the [Massachusetts statute] is wise, that it best fulfills the relevant social and economic objectives that [Massachusetts] might ideally espouse, or that a more just and humane system could not be devised." *Id.,* at 487. We decide only that the system enacted by the Massachusetts Legislature does not deny appellee equal protection of the laws.

*The judgment is reversed.*

Mr. Justice Stevens took no part in the consideration or decision of this case.

Mr. Justice Marshall, dissenting.

Today the Court holds that it is permissible for the Commonwealth of Massachusetts to declare that members of its state police force who have been proved medically fit for service are nonetheless legislatively unfit to be policemen and must be terminated—involuntarily "retired"—because they have reached the age of 50. Although we have called the right to work "of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure," *Truax* v. *Raich,* 239 U. S. 33, 41 (1915), the Court finds that the right to work is not a fundamental right. And, while agreeing that "the treatment of the aged in this Nation has not been wholly free of discrimination," *ante,* at 313, the Court holds that the elderly are not a

---

[11] *E. g.,* M. Barron, The Aging American (1961); Cameron, Neuroses of Later Maturity, in Mental Disorders in Later Life 201 (O. Kaplan, 2d ed. 1956); Senate Special Committee on Aging, Developments in Aging: 1971 and January-March 1972, S. Rep. No. 92–784, pp. 48–53 (1972); Hearings before the Subcommittee on Retirement and the Individual of the Senate Special Committee on Aging, 90th Cong., 1st Sess., pts. 1 and 2, pp. 36–46, 87–100, 121–127, 212–217, 464–471 (1967).

suspect class. Accordingly, the Court undertakes the scrutiny mandated by the bottom tier of its two-tier equal protection framework, finds the challenged legislation not to be "wholly unrelated" to its objective, and holds, therefore, that it survives equal protection attack. I respectfully dissent.

I

Although there are signs that its grasp on the law is weakening, the rigid two-tier model still holds sway as the Court's articulated description of the equal protection test. Again, I must object to its perpetuation. The model's two fixed modes of analysis, strict scrutiny and mere rationality, simply do not describe the inquiry the Court has undertaken—or should undertake—in equal protection cases. Rather, the inquiry has been much more sophisticated and the Court should admit as much. It has focused upon the character of the classification in question, the relative importance to individuals in the class discriminated against of the governmental benefits that they do not receive, and the state interests asserted in support of the classification. *Marshall* v. *United States,* 414 U. S. 417, 432–433 (1974) (MARSHALL, J., dissenting); *San Antonio School District* v. *Rodriguez,* 411 U. S. 1, 98–110 (1973) (MARSHALL, J., dissenting); *Richardson* v. *Belcher,* 404 U. S. 78, 90–91 (1971) (MARSHALL, J., dissenting); *Dandridge* v. *Williams,* 397 U. S. 471, 519–530 (1970) (MARSHALL, J., dissenting). See also *City of Charlotte* v. *Firefighters,* 426 U. S. 283, 286 (1976); *Memorial Hospital* v. *Maricopa County,* 415 U. S. 250, 253–254 (1974); *Dunn* v. *Blumstein,* 405 U. S. 330, 335 (1972); *Kramer* v. *Union School Dist.,* 395 U. S. 621, 626 (1969); *Williams* v. *Rhodes,* 393 U. S. 23, 30 (1968).

Although the Court outwardly adheres to the two-tier model, it has apparently lost interest in recognizing fur-

ther "fundamental" rights and "suspect" classes. See *San Antonio School District* v. *Rodriguez, supra* (rejecting education as a fundamental right); *Frontiero* v. *Richardson*, 411 U. S. 677 (1973) (declining to treat women as a suspect class). In my view, this result is the natural consequence of the limitations of the Court's traditional equal protection analysis. If a statute invades a "fundamental" right or discriminates against a "suspect" class, it is subject to strict scrutiny. If a statute is subject to strict scrutiny, the statute always, or nearly always, see *Korematsu* v. *United States*, 323 U. S. 214 (1944), is struck down. Quite obviously, the only critical decision is whether strict scrutiny should be invoked at all. It should be no surprise, then, that the Court is hesitant to expand the number of categories of rights and classes subject to strict scrutiny, when each expansion involves the invalidation of virtually every classification bearing upon a newly covered category.[1]

But however understandable the Court's hesitancy to invoke strict scrutiny, all remaining legislation should not drop into the bottom tier, and be measured by the mere rationality test. For that test, too, when applied as articulated, leaves little doubt about the outcome; the challenged legislation is always upheld. See *New*

---

[1] Some classifications are so invidious that they should be struck down automatically absent the most compelling state interest, and by suggesting the limitations of strict-scrutiny analysis I do not mean to imply otherwise. The analysis should be accomplished, however, not by stratified notions of "suspect" classes and "fundamental" rights, but by individualized assessments of the particular classes and rights involved in each case. Of course, the traditional suspect classes and fundamental rights would still rank at the top of the list of protected categories, so that in cases involving those categories analysis would be functionally equivalent to strict scrutiny. Thus, the advantages of the approach I favor do not appear in such cases, but rather emerge in those dealing with traditionally less protected classes and rights. See *infra*, at 321–327.

*Orleans* v. *Dukes, ante,* p. 297 (overruling *Morey* v. *Doud,* 354 U. S. 457 (1957), the only modern case in which this Court has struck down an economic classification as irrational). It cannot be gainsaid that there remain rights, not now classified as "fundamental," that remain vital to the flourishing of a free society, and classes, not now classified as "suspect," that are unfairly burdened by invidious discrimination unrelated to the individual worth of their members. Whatever we call these rights and classes, we simply cannot forgo all judicial protection against discriminatory legislation bearing upon them, but for the rare instances when the legislative choice can be termed "wholly irrelevant" to the legislative goal. *McGowan* v. *Maryland,* 366 U. S. 420, 425 (1961).

While the Court's traditional articulation of the rational-basis test does suggest just such an abdication, happily the Court's deeds have not matched its words. Time and again, met with cases touching upon the prized rights and burdened classes of our society, the Court has acted only after a reasonably probing look at the legislative goals and means, and at the significance of the personal rights and interests invaded. *Stanton* v. *Stanton,* 421 U. S. 7 (1975); *Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975); *United States Dept. of Agriculture* v. *Moreno,* 413 U. S. 528 (1973); *Frontiero* v. *Richardson,* 411 U. S., at 691 (POWELL, J., concurring in judgment); *James* v. *Strange,* 407 U. S. 128 (1972); *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972); *Eisenstadt* v. *Baird,* 405 U. S. 438 (1972); *Reed* v. *Reed,* 404 U. S. 71 (1971). See *San Antonio School District* v. *Rodriguez, supra,* at 98–110 (MARSHALL, J., dissenting).[2]

---

[2] See also Gunther, The Supreme Court, 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1 (1972).

These cases make clear that the Court has rejected, albeit *sub silentio,* its most deferential statements of the rationality standard in assessing the validity under the Equal Protection Clause of much noneconomic legislation.

But there are problems with deciding cases based on factors not encompassed by the applicable standards. First, the approach is rudderless, affording no notice to interested parties of the standards governing particular cases and giving no firm guidance to judges who, as a consequence, must assess the constitutionality of legislation before them on an *ad hoc* basis. Second, and not unrelatedly, the approach is unpredictable and requires holding this Court to standards it has never publicly adopted. Thus, the approach presents the danger that, as I suggest has happened here, relevant factors will be misapplied or ignored. All interests not "fundamental" and all classes not "suspect" are not the same; and it is time for the Court to drop the pretense that, for purposes of the Equal Protection Clause, they are.

## II

The danger of the Court's verbal adherence to the rigid two-tier test, despite its effective repudiation of that test in the cases, is demonstrated by its efforts here. There is simply no reason why a statute that tells able-bodied police officers, ready and willing to work, that they no longer have the right to earn a living in their chosen profession merely because they are 50 years old should be judged by the same minimal standards of rationality that we use to test economic legislation that discriminates against business interests. See *New Orleans* v. *Dukes, supra; Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955). Yet, the Court today not only invokes the minimal level of scrutiny, it wrongly adheres to it. Anal-

ysis of the three factors I have identified above—the importance of the governmental benefits denied, the character of the class, and the asserted state interests—demonstrates the Court's error.

Whether "fundamental" or not, " 'the right of the individual . . . to engage in any of the common occupations of life' " has been repeatedly recognized by this Court as falling within the concept of liberty guaranteed by the Fourteenth Amendment. *Board of Regents* v. *Roth,* 408 U. S. 564, 572 (1972), quoting *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923). As long ago as *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746 (1884), Mr. Justice Bradley wrote that this right "is an inalienable right; it was formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence . . . . This right is a large ingredient in the civil liberty of the citizen." *Id.,* at 762 (concurring opinion). And in *Smith* v. *Texas,* 233 U. S. 630 (1914), in invalidating a law that criminally penalized anyone who served as a freight train conductor without having previously served as a brakeman, and that thereby excluded numerous equally qualified employees from that position, the Court recognized that "all men are entitled to the equal protection of the law in their right to work for the support of themselves and families." *Id.,* at 641.

> "In so far as a man is deprived of the right to labor his liberty is restricted, his capacity to earn wages and acquire property is lessened, and he is denied the protection which the law affords those who are permitted to work. Liberty means more than freedom from servitude, and the constitutional guarantee is an assurance that the citizen shall be protected in the right to use his powers of mind and body in any lawful calling." *Id.,* at 636.

See also *Arnett* v. *Kennedy,* 416 U. S. 134 (1974); *Perry* v. *Sindermann,* 408 U. S. 593 (1972); *Bell* v. *Burson,* 402

U. S. 535 (1971); *Keyishian* v. *Board of Regents,* 385 U. S. 589, 605–606 (1967); *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, 238–239 (1957); *Slochower* v. *Board of Higher Education,* 350 U. S. 551 (1956); *Wieman* v. *Updegraff,* 344 U. S. 183 (1952); *Truax* v. *Raich,* 239 U. S., at 41. Even if the right to earn a living does not include the right to work for the government,[3] it is settled that because of the importance of the interest involved, we have always carefully looked at the reasons asserted for depriving a government employee of his job.

While depriving any government employee of his job is a significant deprivation, it is particularly burdensome when the person deprived is an older citizen. Once terminated, the elderly cannot readily find alternative employment. The lack of work is not only economically damaging, but emotionally and physically draining. Deprived of his status in the community and of the opportunity for meaningful activity, fearful of becoming dependent on others for his support, and lonely in his new-found isolation, the involuntarily retired person is susceptible to physical and emotional ailments as a direct consequence of his enforced idleness. Ample clinical evidence supports the conclusion that mandatory retirement poses a direct threat to the health and life expectancy of the retired person,[4] and these consequences of termination for age are not disputed by appellants.

---

[3] See *Board of Regents* v. *Roth,* 408 U. S. 564, 587 (1972) (MARSHALL, J., dissenting). Appellee makes no such claim; nor does he allege that procedural due process requires that he be afforded a hearing prior to termination.

[4] See American Medical Association, Committee on Aging, Retirement, A Medical Philosophy and Approach; M. Barron, The Aging American 76–86, and sources cited (1961). Because, as one former AMA president bluntly put it, "[d]eath comes at retirement," quoted in M. Barron, *id.,* at 76, the AMA has formally taken a position against involuntary retirement and has submitted an *amicus* brief in this case to inform us of the medical consequences of the practice.

Thus, an older person deprived of his job by the government loses not only his right to earn a living, but, too often, his health as well, in sad contradiction of Browning's promise: "The best is yet to be,/The last of life, for which the first was made." [5]

Not only are the elderly denied important benefits when they are terminated on the basis of age, but the classification of older workers is itself one that merits judicial attention. Whether older workers constitute a "suspect" class or not, it cannot be disputed that they constitute a class subject to repeated and arbitrary discrimination in employment. See United States Department of Labor, The Older American Worker: Age Discrimination in Employment (1965); M. Barron, The Aging American 55–68 (1961). As Congress found in passing the Age Discrimination in Employment Act of 1967:

> "[I]n the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs[.]
>
> "[T]he setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons[.]
>
> "[T]he incidence of unemployment, especially long-term unemployment with resultant deterioration of skill, morale, and employer acceptability is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave[.]" 81 Stat. 602, 29 U. S. C. § 621 (a) (subsection numbers omitted).

See also *ante,* at 317 n. 11.

---

[5] R. Browning, Rabbi Ben Ezra, stanza 1.

Of course, the Court is quite right in suggesting that distinctions exist between the elderly and traditional suspect classes such as Negroes, and between the elderly and "quasi-suspect" classes such as women or illegitimates. The elderly are protected not only by certain anti-discrimination legislation, but by legislation that provides them with positive benefits not enjoyed by the public at large. Moreover, the elderly are not isolated in society, and discrimination against them is not pervasive but is centered primarily in employment. The advantage of a flexible equal protection standard, however, is that it can readily accommodate such variables. The elderly are undoubtedly discriminated against, and when legislation denies them an important benefit—employment—I conclude that to sustain the legislation appellants must show a reasonably substantial interest and a scheme reasonably closely tailored to achieving that interest. Cf. *San Antonio School District* v. *Rodriguez,* 411 U. S., at 124–126 (MARSHALL, J., dissenting). This inquiry, ultimately, is not markedly different from that undertaken by the Court in *Reed* v. *Reed,* 404 U. S. 71 (1971).

Turning, then, to appellants' arguments, I agree that the purpose of the mandatory retirement law is legitimate, and indeed compelling. The Commonwealth has every reason to assure that its state police officers are of sufficient physical strength and health to perform their jobs. In my view, however, the means chosen, the forced retirement of officers at age 50, is so overinclusive that it must fall.

All potential officers must pass a rigorous physical examination. Until age 40, this same examination must be passed every two years—when the officer re-enlists—and, after age 40, every year. Appellants have conceded that "[w]hen a member passes his re-enlistment or annual physical, he is found to be qualified to perform all of

326

the duties of the Uniformed Branch of the Massachusetts State Police." App. 43. See id., at 52. If a member fails the examination, he is immediately terminated or refused re-enlistment. Thus, the only members of the state police still on the force at age 50 are those who have been determined—repeatedly—by the Commonwealth to be physically fit for the job. Yet, all of these physically fit officers are automatically terminated at age 50. Appellants do not seriously assert that their testing is no longer effective at age 50,[6] nor do they claim that continued testing would serve no purpose because officers over 50 are no longer physically able to perform their

---

[6] There may be an age at which passing a physical examination provides no substantial guarantee that the officer is fit for service for the coming year. In that case, the test has lost its predictive ability. There is no showing that age 50 marks such a line— although appellants ask us to hypothesize that it does—and indeed the evidence seems contrary to that supposition. First, among officers aged 40–49, who undergo yearly examinations, there is no general trend of increasing rejections with age nor any suggestion that those who passed the examination served in less than a satisfactory manner. 376 F. Supp. 753, 756 (Mass. 1974).

This evidence presents no reason to assume that testing suddenly loses its predictive ability after age 50. The only relevant studies presented are contrary to appellants' assumption. These studies support the conclusion that airline pilots should be terminated at age 60 because after that age medical examinations lose their predictive ability. See Air Line Pilots Assn., Int'l v. Quesada, 276 F. 2d 892 (CA2 1960).

The suggestion that age 50 is not the critical point for predictive ability is also supported by the national experience. Appellee has produced a study of the laws of the 50 States that shows that Massachusetts' age-50 retirement law prescribes the earliest retirement age in the Nation, and that no other State requires its state police to retire before age 55. Brief for Appellee 37 n. 14.

In short, I refuse to hypothesize that testing after age 50 loses its predictive ability when the appellants have introduced absolutely nothing that supports this position.

jobs.[7] Thus the Commonwealth is in the position of already individually testing its police officers for physical fitness, conceding that such testing is adequate to determine the physical ability of an officer to continue on the job, and conceding that that ability may continue after age 50. In these circumstances, I see no reason at all for automatically terminating those officers who reach the age of 50; indeed, that action seems the height of irrationality.

Accordingly, I conclude that the Commonwealth's mandatory retirement law cannot stand when measured against the significant deprivation the Commonwealth's action works upon the terminated employees. I would affirm the judgment of the District Court.[8]

---

[7] Indeed, the appellants have conceded that "[a]ny individual member of the Uniformed Branch . . . whose age is fifty years or more may be capable of performing the physical activity required of the Uniformed Branch . . . depending upon his individual physical condition." App. 44. See id., at 52.

[8] The Court's conclusion today does not imply that all mandatory retirement laws are constitutionally valid. Here the primary state interest is in maintaining a physically fit police force, not a mentally alert or manually dexterous work force. That the Court concludes it is rational to legislate on the assumption that physical strength and well-being decrease significantly with age does not imply that it will reach the same conclusion with respect to legislation based on assumptions about mental or manual ability. Accordingly, a mandatory retirement law for all government employees would stand in a posture different from the law before us today.