**SPECIAL PROGRAMS, INC., Plaintiff,**

v.

**J. Carlton COURTER, III, in his capacity as the Commissioner of the Department of Agriculture and Consumer Services of the Commonwealth of Virginia, Defendant.**

**Civil Action No. 3:95CV609.**

United States District Court,
E.D. Virginia,
Richmond Division.

April 15, 1996.

Warren David Harless, J. Tracy Walker, IV, John Willard Montgomery, Jr., Craig Thomas Merritt, Christian & Barton, Richmond, VA, for Plaintiff.

Joshua Noah Lief, David Benjamin Irvin, Anne Marie Cushmac, Edward Paul Nolde, Office of Attorney General, Richmond, VA, for Defendant.

## AMENDED MEMORANDUM OPINION

RICHARD L. WILLIAMS, Senior District Judge.

This case is before the Court on cross-motions for summary judgment on the constitutionality of various provisions of the Virginia Solicitation of Contributions statute. For the reasons stated below, the Court declares that the exception from the definition of charitable organization provided for labor unions and trade associations by VA.CODE ANN. § 57–48 (Michie 1995) is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment, and permanently enjoins the Commissioner from enforcing it.

### I.

This case finds its genesis in the activities of Smokey Mountain Secrets, Inc. ("Smokey Mountain"), which operated as a professional solicitor on behalf of charitable organizations in Virginia from 1985 to 1994, and exclusively on behalf of the Virginia State Police Associ-ation ("VSPA") from 1988 onwards. Over that six-year period, Smokey Mountain sold food products packaged under its name, retaining 87.5% of the proceeds and remitting the remaining 12.5% to VSPA.

Smokey Mountain met with the Division of Consumer Affairs ("DCA") on June 2, 1994 to discuss plans for door-to-door marketing, which would be conducted under the name Special Programs, Inc. ("Special Programs"). DCA informed Smokey Mountain at that time that it was investigating its business. On July 1, 1994, Smokey Mountain and VSPA entered into a new royalty agreement; the same day, Smokey Mountain subcontracted its obligations to Special Programs. Special Programs has continued to sell, through telemarketing, products packaged under the Smokey Mountain name, as a subcontractor of Smokey Mountain.

On February 14, 1995, the Commonwealth of Virginia sued Smokey Mountain, alleging violations of the Solicitation of Contributions statute and the Virginia Consumer Protection Act. Special Programs then sued the Commissioner of the Department of Agriculture and Consumer Services ("Commissioner") on July 28, 1995. In Count 1 of the complaint, Special Programs sought to have the exception from the statute provided for the American Red Cross declared unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. In Count 2, it sought to have the exception from the definition of charitable organization provided to labor unions and trade associations declared unconstitutional, again under the Equal Protection Clause. In Count 3, Special Programs sought to have the distinction drawn in the statute between professional solicitors and the employees and officers of charitable organizations declared unconstitutional, also under the Equal Protection Clause. Subsequently, on September 29, 1995, immediately before the hearing on the Commissioner's motion to dismiss, the Commonwealth sued Special Programs under the statute as well. On October 5, 1995, the Court entered an order dismissing Count 1 under the doctrine of *Younger* abstention, *see Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (except in special

circumstances, federal courts forbidden to enjoin pending state court criminal proceedings); *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975) (pending criminal proceeding need not be brought before commencement of the suit, but only before proceedings of substance on the merits); *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (*Younger* abstention applies to pending state civil enforcement proceedings), but retaining Counts 2 and 3. The parties and the Court agreed that summary judgment was appropriate on the remaining counts, *see* FED. R.CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), and the Court issued a Memorandum Opinion and Order on March 7, 1996. The Commissioner filed a motion to alter or amend the judgment pursuant to FED.R.CIV.P. 59(e), and the Court stayed enforcement of its previous Order pending resolution of the Commissioner's motion. The Court now grants the Commissioner's motion to alter or amend the judgment, and issues this Amended Memorandum Opinion.

## II.

### A.

▓ The parties disagree as to the applicable standard of review. The Commissioner, in his briefs, argues that both of Special Programs's equal protection claims should be analyzed using the rational basis test. Under this test, if the Commissioner can articulate a rational basis for the distinctions drawn in the statute, it is constitutional. Special Programs, on the other hand, argues for what in common parlance is referred to as strict scrutiny. In order to pass strict scrutiny, the statute must be narrowly tailored to address a compelling government interest. As one might expect, few statutes can withstand this test.

▓ Analysis of the applicable standard of review begins with the proposition that charitable solicitations are fully protected speech under the First Amendment. *See Riley v.*

*National Federation of the Blind,* 487 U.S. 781, 787–89, 108 S.Ct. 2667, 2672–73, 101 L.Ed.2d 669 (1988); *Telco Communications, Inc. v. Carbaugh,* 885 F.2d 1225, 1230 (4th Cir.1989) ("[C]haritable solicitations are so intertwined with speech that they are entitled to the protections of the First Amendment." (quoting *Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 959, 104 S.Ct. 2839, 2848, 81 L.Ed.2d 786 (1984))), *cert. denied,* 495 U.S. 904, 110 S.Ct. 1923, 109 L.Ed.2d 286 (1990). This proposition holds true even if the solicitor is compensated for his or her speech. *See Riley,* 487 U.S. at 801, 108 S.Ct. at 2680 ("It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak."). Nonetheless, the government may regulate charitable solicitations if such regulation is narrowly tailored to serve a compelling state interest; that is, the regulation meets strict scrutiny. *See Village of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980) ("The Village may serve its legitimate interests, but it must do so by narrowly drawn regulations designed to serve those interests without necessarily interfering with First Amendment freedoms."); *Riley,* 487 U.S. at 799 n. 11, 108 S.Ct. at 2679 (requirement that fundraiser disclose professional status constitutional).

▓ The challenges to the solicitation statute in the instant case, however, are not to its requirements *per se;* rather, they are to the exclusion of labor unions and trade associations from its definition of charitable organization and to its differing treatment of professional solicitors and the officers and employees of charitable organizations. Special Programs does not claim that the challenged portions of the statute *ipso facto* violate its rights under the First Amendment by placing impermissible regulations upon protected speech, but rather that they violate the Equal Protection Clause of the Fourteenth Amendment. That clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87

L.Ed.2d 313 (1985); *accord F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920) (Equal Protection Clause mandates that "all persons similarly circumstanced shall be treated alike.").

■■■ In *Plyler v. Doe*, 457 U.S. 202, 216–17, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982), the Supreme Court endorsed strict scrutiny analysis of such claims, stating

> The Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional premises. Thus we have treated as presumptively invidious those classifications that ... impinge upon the exercise of a "fundamental right." With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest.

*See also Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 666, 110 S.Ct. 1391, 1401, 108 L.Ed.2d 652 (1990) ("[S]tatutory classifications impinging upon [a fundamental] right must be narrowly tailored to serve a compelling governmental interest."); *Police Dep't of the City of Chicago v. Mosley*, 408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972) ("The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives."). As stated previously, charitable solicitation is a fundamental right guaranteed under the First Amendment. Consequently, any statute which, by virtue of classifications contained within it, impinges upon the ability of some persons or organizations to so solicit, is subject to strict scrutiny with regard to those classifications. It makes no difference that the restriction placed upon some classes under the statute does not, in and of itself, violate the First Amendment. The Equal Protection Clause is an additional guarantee that *otherwise permissible* government restrictions will be applied in an even-handed manner, not unduly favoring some over others.

## B.

At oral argument, the Commissioner conceded that strict scrutiny applied to Count 2 of the complaint, but insisted that Count 3 was subject to rational basis analysis under the Sixth Circuit's opinion in *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1481–83 (6th Cir.1995), *petition for cert. filed*, 64 U.S.L.W. 3576 (U.S. Feb. 14, 1996) (No. 95–1295). The Commissioner argues that strict scrutiny applies to legislative classifications only when such classifications are content-based. Special Programs in response argues that *Dayton* did not correctly apply the rule established in the Supreme Court cases above. Both parties misconstrue the analysis of the Sixth Circuit in *Dayton*.

The Sixth Circuit in *Dayton* began its equal protection analysis by stating that "[s]trict scrutiny need be applied to legislative classifications only when 'the classification impermissibly interferes with the exercise of a fundamental right....'" *Id.* at 1481 (quoting *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976)). Special Programs takes issue with the word "impermissibly." If strict scrutiny of statutory classifications under the Equal Protection Clause is triggered only when their interference with the exercise of a fundamental right is impermissible, says Special Programs, then in essence the court must find that the statute violates the fundamental right prior to engaging in equal protection analysis. In that case, equal protection analysis would be superfluous, as the statute would already have been declared unconstitutional because of its violation of the underlying fundamental right. Put another way, if strict scrutiny is only triggered by something that has already been determined to be impermissible, why then the need for strict scrutiny?

Logic thus dictates that "impermissibly" must be surplusage. Of the several Supreme Court cases holding that classifications which interfere with the exercise of a fundamental right trigger strict scrutiny, *Murgia* is the only one which uses the word "impermissibly." The trilogy of *Mosley*, *Plyler*, and *Austin* demonstrates that it is mere impinge-

ment upon, not impermissible interference with, the exercise of a fundamental right that triggers strict scrutiny. In *Dayton* itself the Sixth Circuit refused to apply strict scrutiny to the claim that the statute treated large and small charities differently because the plaintiffs were unable to establish *any* interference with the fundamental right to free speech. *See id.* at 1482. Thus despite *Dayton's* quotation from *Murgia*, its actual analysis follows that laid out by the Supreme Court in *Mosley, Plyler,* and *Austin.*

The Commissioner, on the other hand, argues that *Dayton* stands for the proposition that "the constitutional scrutiny to be applied in an equal protection challenge varies with the substance of the challenge." Commissioner's Reply Brief at 2. He comes to that conclusion because while the Sixth Circuit in *Dayton* applied strict scrutiny to the plaintiff's free speech claim, *see id.* at 1481–82, it applied only rational basis analysis to its Establishment Clause claim, *see id.* at 1483. The *Dayton* court did so, however, because the Supreme Court, in *Corporation of the Presiding Bishop v. Amos,* 483 U.S. 327, 339, 107 S.Ct. 2862, 2870, 97 L.Ed.2d 273 (1987), stated that a statute held constitutional under the *Lemon* test, *see Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and so which did not violate the substantive rights guaranteed by the Establishment Clause need not have its classifications analyzed under strict scrutiny; rational basis analysis is sufficient. The Commissioner is correct in that the substance of an equal protection challenge affects the degree of scrutiny to be applied: strict scrutiny is applied except in Establishment Clause cases. Needless to say, the instant case does not fall within that narrow exception.

In light of the above case law, the Commissioner's next contention is surprising: "[L]egislative classifications which purportedly favor one group of speakers at the expense of others are not subject to strict scrutiny unless they are content-based." Commissioner's Reply Brief at 2. In support of this view, he cites two cases: *Carey v. Brown,* 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980) and *Turner Broadcasting Sys., Inc. v. Federal Commu-*

*nications Comm'n,* 819 F.Supp. 32 (D.D.C. 1993) (three-judge court), *vacated,* — U.S. —, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). The Commissioner misapprehends the meaning of both. In *Carey,* the Supreme Court stated that "[w]hen government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized." *Carey,* 447 U.S. at 461–62, 100 S.Ct. at 2290–91. In support of this proposition, the Supreme Court cited *Mosley.* From its language and the citation to *Mosley,* it is apparent that *Carey* is another in the line of cases discussed above that mandates strict scrutiny for Equal Protection Clause challenges to statutes affecting fundamental rights. In *Carey,* the Supreme Court applied *Mosley* to a specific fact pattern involving an anti-picketing statute that made an exception for labor picketing. For that reason, the rule quoted above from *Carey* is rather narrow, although even it talks about "discriminat[ion] among speech-related activities" requiring strict scrutiny and does not limit itself merely to content-based distinctions, although it was such a distinction which was held unconstitutional in *Carey.* Nothing in *Carey* limits, however, the broad rule enunciated in *Mosley,* and reaffirmed in *Plyler* and *Austin* that strict scrutiny applies to all legislative distinctions which impinge upon a fundamental right.

*Turner Broadcasting* is even more inapposite, because it is not even an Equal Protection Clause case. In *Turner Broadcasting,* the plaintiff sought to have the "must-carry" provisions of the 1992 Cable Act struck down as unconstitutional because they required cable systems owned by it that the must-carry provisions amounted to forced speech. The plaintiff's argument, then, was that the must-carry provisions of the 1992 Cable Act were unconstitutional directly under the First Amendment, because they were compelled speech. No equal protection challenge was raised, nor could have one been, because all cable operators were subject to the same provisions; no differing legislative classifica-

tions were present in the law. *See Turner Broadcasting,* 819 F.Supp. at 42.

■ In *Turner Broadcasting,* the District Court wrote that "[s]trict scrutiny applies only if governmental regulation is overtly content-based or presents an opportunity for official censorship." This limited use of strict scrutiny is correct when discussing an attack upon the constitutionality of a statute made directly under the First Amendment. As the trilogy of *Mosley, Plyler,* and *Austin* establishes, however, when the statute is challenged under the Equal Protection Clause, it is subject to strict scrutiny whenever it impinges upon a fundamental right. And, as noted above, for equal protection purposes, such impingement need not violate the First Amendment directly; its differential effect upon various speakers can in and of itself violate the Equal Protection Clause, even if the regulation is permissible under the underlying substantive constitutional provision.

### C.

■ Thus, strict scrutiny applies to all the claims raised by Special Programs. The burden of proof is on the Commissioner; he must demonstrate that the challenged statute is constitutional. *See Telco,* 885 F.2d at 1230 ("[T]he state bears the burden of showing that its regulation" conforms to the applicable standard of review.); *Plyler,* 457 U.S. at 216–17, 102 S.Ct. at 2394–95 ("[I]t is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest.").

### III.

### A.

### 1.

The Virginia Solicitation of Contributions statute defines a charitable organization as follows:

"*Charitable organization*" means any person which is or holds itself out to be organized or operated for any charitable purpose, or any person which solicits or obtains contributions solicited from the public. This definition shall not be deemed to include (i) any church or convention or association of churches primarily operated for nonsecular purposes and no part of the net income of which inures to the direct benefit of any individual; (ii) any political party as defined in § 24.2–101 or any political campaign committee required by state or federal law to file a report or statement of contributions and expenditures; (iii) any labor union registered under § 40.1–76 nor any trade association; or (iv) any authorized individual who solicits, by authority of such organization, solely on behalf of a registered or exempt charitable organization or on behalf of an organization excluded from the definition of charitable organization.

VA.CODE ANN. § 57–48 (Michie 1995).

Special Programs challenges the exceptions from the definition of charitable organization provided to labor unions and to trade associations. It contends that no compelling governmental interest is served by these exceptions, and thus they violates the Equal Protection Clause. Special Programs has standing because under the statute, a professional solicitor is "any person who, for a financial or other consideration, solicits contributions for, on behalf of, a charitable or civic organization." VA.CODE ANN. § 57–48 (Michie 1995). Professional solicitors are subject to a plethora of regulations under the statute. *See* VA.CODE ANN. §§ 57–55.2 & 57–61 (Michie 1995). But because labor unions and trade associations are exempt from the definition of charitable organizations, professional solicitors on their behalf are not subject to these regulations. Thus, the exceptions to the definition of charitable organization directly affect Special Programs, as it exclusively solicits on behalf of the VSPA, which is considered a charitable organization under the statute. Furthermore, solicitation by charitable organizations and their professional solicitors is subject to investigation and prosecution by the Commissioner and the Attorney General. *See* VA.CODE ANN. § 57–59 (Michie 1995). Again the exemption provided labor unions and trade associations means that they are immune from these in-

vestigatory and prosecutorial powers. Special Programs does not challenge the other exceptions contained in the statute; thus, the validity of these exceptions is not before the Court.

### 2.

The Commissioner attempts to justify the exception for labor unions by arguing that because VA.CODE ANN. § 40.1–76 was repealed in 1991, *see* 1991 VA.ACTS, ch. 443, no labor unions are currently registered under it, and therefore the exception does not apply to any currently existing entities. As no labor unions can now meet the exception, all labor unions which solicit are now considered charitable organizations under VA.CODE ANN. § 57–48 (Michie 1995). *See Vollin v. Arlington County Electoral Bd.*, 216 Va. 674, 222 S.E.2d 793, 797 (1976) ("The plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow or strained construction."). Special Programs disagrees with this interpretation, claiming that repeal by implication is disfavored in Virginia, and that the proper interpretation of the statute is that all labor unions, registered or not, may avail themselves of the exception. *See Board of Supervisors of Albemarle County v. Marshall*, 215 Va. 756, 214 S.E.2d 146, 150 (1975). It further notes that nothing prohibits the Commissioner from changing his interpretation of the law. Either way, the Commissioner has not attempted to defend the exception for labor unions, if any remains. The burden is on the government to justify its classifications, *see Telco*, 885 F.2d at 1230; it has failed to do so. Thus, the Court holds that the exception for labor unions violates the Equal Protection Clause of the Fourteenth Amendment, because the government has not articulated a compelling state interest for the exception.

### 3.

The Commissioner justifies the exception for trade associations[1] on "the well-known fact that many Virginia trade associations expend monies lobbying the General Assembly on issues related to the industry of their members," Commissioner's Brief at 24, and thus they are regulated by the Lobbying Disclosure and Regulation Act, VA.CODE ANN. §§ 2.1–779 to 2.1–794 (Michie 1995). The duplicative reporting required if such associations had to register under the Virginia Solicitations of Contributions statute, according to the Commissioner, would be wasteful. Furthermore, he argues that trade associations are more likely to solicit from those familiar with their goals, as opposed to the general public, and notes in support of this proposition that over the past seventeen years, no complaints have been filed about trade associations with regard to the solicitation activities.

This argument fails to articulate a compelling state interest. The disclosures required under the Lobbying Disclosure and Regulation Act are less onerous than those required by the Solicitation of Contributions statute. Specifically, the former does not require the organization to disclose its principal source of funds. Nor is the lack of complaints concerning trade associations probative. As trade associations are not subject to regulations by the Commissioner, it is unsurprising that he has not received any complaints concerning them.

Even if a compelling state interest existed, however, the exception for trade associations fails strict scrutiny because it is not narrowly tailored. The VSPA, which does not qualify as a trade association, has three registered lobbyists. If disclosure under the Lobbying Disclosure and Regulation Act is sufficient so as to make registration under the Solicitation of Contributions statute duplicative, then any organization which lobbies should be excepted from the registration requirements of the Solicitation of Contributions statute. Thus, the exception for trade associations is under-inclusive, in that organizations which lobby,

---

**1.** Over the life of the statute, "trade association" has had five different definitions. Prior to this lawsuit, a trade association was defined as an I.R.C. § 501(c)(6) tax exempt organization. Realizing that the distinction between an I.R.C. § 501(c)(6) tax exempt organization and an I.R.C. § 501(c)(5) tax exempt organization, such

as the VSPA, was indefensible, the Commissioner, after the commencement of this lawsuit, changed the definition to that found in BLACK'S LAW DICTIONARY 1493 (6th ed. 1990). Although the statute is analyzed using the current definition, the same analysis concerning its constitutionality holds for any of the prior definitions.

but which are not trade associations, still must register under the Solicitations of Contributions statute. Likewise, absolutely no evidence exists in the record that trade associations generally lobby, much less that all trade associations lobby. Thus, the exception is also overinclusive, in that it includes organizations not covered under the Lobbying Disclosure and Regulation Act. Consequently, *Streich v. Pennsylvania Comm'n on Charitable Orgs.*, 579 F.Supp. 172, 179–80 (M.D.Pa.1984) (upholding exclusion from charitable solicitation act for organizations supervised under other state laws) is inapplicable, as trade associations are not, in fact, regulated under other state laws. Therefore, because the exception for trade associations does not serve a compelling governmental interest and is not narrowly tailored, it violates the Equal Protection Clause of the Fourteenth Amendment.

### B.

#### 1.

The Virginia Solicitations of Contributions statute provides in its definition of professional solicitor that "[a] bona fide salaried officer or employee of a registered or exempt charitable organization or a bona fide salaried officer or employee of a registered parent organization shall not be deemed to be a professional solicitor." VA.CODE ANN. § 57–48 (Michie 1995). Such bona fide officers and employees thus do not have to comply with the regulations imposed upon professional solicitors. In particular, they do not have to make a detailed disclosure of their professional status, *see* VA.CODE ANN. § 57–55.2 (Michie 1995), and they do not have to comply with the registration and record-keeping requirements for professional solicitors detailed in VA.CODE ANN. § 57–61 (Michie 1995), the most onerous of which is the posting of a $20,000 bond, *see* VA.CODE ANN. § 57–61(B) (Michie 1995). As noted above, charitable solicitation speech does not lose its constitutional protection merely because the speaker is compensated. *See Riley*, 487 U.S. at 801, 108 S.Ct. at 2680. Therefore, the distinction drawn between professional solicitors and those directly employed by the

speaking organization by the statute must withstand strict scrutiny.

The Commissioner argues that a very similar provision was upheld by the Second Circuit in *National Awareness Found. v. Abrams*, 50 F.3d 1159, 1167 (2d Cir.1995). It is true that the statute at issue in *National Awareness* distinguished between professional solicitors and employees of charitable organizations. But the burden imposed by the statute was small—professional solicitors had to register with the state and pay an $80 fee—and charitable organizations had to register with the state and pay registration fees under other related statutory provisions. *See id.* at 1168. The provision at issue was "designed to regulate independent professional solicitors who are not otherwise regulated." *Id.* The Commissioner notes that charitable organizations must register pursuant to VA.CODE ANN. § 57–49 (Michie 1995) and keep record pursuant to VA.CODE ANN. § 57–53 (Michie 1995). Thus, he argues, the professional solicitor registration statute regulates otherwise unregulated entities. *See also American Ass'n of State Troopers, Inc. v. Preate*, 825 F.Supp. 1228, 1235 (M.D.Pa. 1993), *reconsideration denied*, 832 F.Supp 894 (M.D.Pa.1993).

#### 2.

The registration statute for professional solicitors in Virginia, however, places an additional burden upon them beyond those at issue in *National Awareness:* the $20,000 bond. The Commissioner puts forth two compelling state interests he claims justify the bond: (1) the bond protects charitable organizations from fraud by professional solicitors, and (2) the bond protects the Commonwealth of Virginia and its citizens from fraud by professional solicitors.

The first interest articulated by the Commissioner does not constitute a compelling state interest. Unlike members of the public, who are solicited uninvited and who have little knowledge of the charity or its solicitor, charitable organizations negotiate contracts with professional solicitors at arm's length on a level playing field. Charitable organizations are not presented contracts of adhesion, which they must merely accept or reject. If a charitable organization wishes for a bond

from its professional solicitor, it can negotiate for one in its contract. Unlike potential individual contributors, charitable organizations do not need the state's protection from fraud.

The second interest articulated by the Commissioner does, however, constitute a compelling state interest. The Virginia Solicitation of Contributions statute itself shows that the bond protects the Commonwealth of Virginia and its citizens. *See* VA.CODE ANN. § 57–61(B) (Michie 1995) ("The bond shall run to the Commonwealth of Virginia for the use of the bonds in reimbursement for any penalties or losses resulting from malfeasance, nonfeasance or misfeasance in the conduct of solicitation activities."). The record in this case shows that professional solicitors are much more likely to engage in fraud than charitable organizations. The vast majority of charitable solicitation complaints received by the Commissioner over the last seventeen years relate to professional solicitors. This fact is unsurprising, given that professional solicitors solicit in order to make a profit, while charitable organizations are motivated by more altruistic concerns. The General Assembly of Virginia has concluded that this greater incidence of complaints warrants requiring professional solicitors to post a bond in order to protect the public. Such protection is at the heart of the function of state government, and constitutes a compelling state interest for requiring professional solicitors, but not salaried employees and officers of charitable organizations, to post the bond.

### 3.

Having found a compelling state interest, the next question is whether the $20,000 bond is narrowly tailored, as to both the entities covered by it and its amount. All independent contractors of charitable organizations, plus those employees and officers of such organizations who are paid on a commission basis, qualify as professional solicitors and must post the bond. As noted above in III.B.2., *supra*, the record before the Court shows that these two separate, but overlapping, groups have a significantly higher incidence of complaints filed against them. They are also the groups most affected by the profit motive, as success in soliciting determines whether they obtain future contracts or the amount of their compensation. While total protection to the Commonwealth of Virginia and its citizens would be afforded by requiring all groups involved in charitable solicitation to post the bond, the higher incidence of complaints filed against those currently falling within the definition of professional solicitor and the profit motive to which they are subject justifies applying the bond only to them. In fact, the limited number of entities required to post the bond demonstrate that it is narrowly tailored: the General Assembly only required those entities most likely to defraud the public, based upon past experience, to post the bond.

Likewise, the amount of the bond is narrowly tailored. A professional solicitor is subject to a civil penalty of up to $5,000 for each violation of the Virginia Solicitation of Contributions statute. *See* VA.CODE ANN. § 57–59(D) (Michie 1995). Thus, the amount of the bond equals the maximum penalty for four violations of the statute. In addition, "[a] partnership or corporation which is a professional solicitor may file a consolidated bond on behalf of all its members, officers, agents and employees." VA.CODE ANN. § 57–61(B) (Michie 1995). For example, Special Programs need only post one $20,000 bond which will cover all its employees. Thus, while the bond is a more onerous requirement than those at issue in *National Awareness*, it is not significantly more so such that it fails to be narrowly tailored. Therefore, because the $20,000 bond required of professional solicitors serves a compelling state interest and is narrowly tailored, it does not violate the Equal Protection Clause of the Fourteenth Amendment.

### 4.

As for the disclosure mandated by VA.CODE ANN. § 57–55.2 (Michie 1995), the Supreme Court has stated that such requirements are narrowly tailored to serve a compelling governmental interest in the charitable solicitation context. *See Riley*, 487 U.S. at 799 n. 11, 108 S.Ct. at 2679 n. 11 (requirement that fundraiser disclose professional status constitutional). Thus, the disclosure requirement for professional solicitors is constitutional under the Equal Protection

Clause. Likewise, the remaining record-keeping and registration requirements imposed upon professional solicitors are similar in nature to those imposed upon charitable organizations, showing that their purpose is to regulate otherwise unregulated entities. *See National Awareness,* 50 F.3d at 1168. Thus, they too are constitutional.

## IV.

Special Programs has asked for declaratory and injunctive relief. The Commissioner has asked that if the Court determines Special Programs is entitled to relief, that only those portions of the statute found to violate the Equal Protection Clause be declared invalid, in keeping with the severability provision of the Virginia Code. *See* VA.CODE. ANN. § 1–17.1 (Michie 1995). Therefore, in the accompanying Order, the Court shall declare that the exception for labor unions and trade associations from the definition of charitable organization contained in VA.CODE ANN. § 57–48 (Michie 1995) is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment, and shall permanently enjoin the Commissioner from enforcing it.

## V.

For the reasons stated above, the Court declares that the exception from the definition of charitable organization provided for labor unions and trade associations by VA. CODE ANN. § 57–48 (Michie 1995) is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment, and permanently enjoins the Commissioner from enforcing it.

Let the Clerk send a copy of this Amended Memorandum Opinion and the accompanying Order to all counsel of record.