Ambrose KLAIN, Plaintiff,

v.

The PENNSYLVANIA STATE UNIVER-
SITY et al., Defendants.

Civ. A. No. 76–717.

United States District Court,
M. D. Pennsylvania.

July 18, 1977.

John D. Killian, Robert W. Barton, Killian & Gephart, Harrisburg, Pa., for Abrose Klain.

Delbert J. McQuaide, McQuaide, Blasko & Brown, Inc., State College, Pa., for Pennsylvania State University, et al.

## MEMORANDUM AND ORDER

HERMAN, District Judge.

 Plaintiff has instituted the above-captioned matter pursuant to § 1983, 42 U.S.C. and 28 U.S.C. § 1331 seeking to challenge the constitutionality of the mandatory retirement policy imposed on all faculty and staff of The Pennsylvania State University at age 65.[1] In our memorandum and order of November 15, 1976 we dismissed plaintiff's procedural due process claim in light of the recent United States Supreme Court decision in *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).[2] We did conclude, however, that a

---

1. The applicable mandatory retirement policy was initially adopted in 1935, but was amended several times thereafter and on December 12, 1972 acquired its present form, as follows:

 "The July 1 coincident with or next following the 65th birthday shall be the mandatory retirement date for the faculty and staff of the University. However, under unusual circumstances an administrative officer may request the continuance of an employee past age 65 on a year-to-year basis. Such a request is submitted through channels to the President. The President will consider such requests from year to year until the employee reaches his 70th birthday, at which time he becomes ineligible for re-employment." P.S.–51, the Pennsylvania State University Policy Manual.

2. In response to the motion for summary judgment, plaintiff now contends that while perhaps not set forth in the complaint in an adequate manner, the property interest necessary to invoke the due process protections of the fourteenth amendment is in fact established in the affidavits and documents submitted to the court. It is sufficient that the claim was dismissed pursuant to Fed.R.Civ.P. 12(b) for failure of the *complaint* to state a cause of action which would entitle plaintiff to the relief requested.

 Notwithstanding our prior decision in this connection, we believe that the existence of a provision for and the mere possibility that plaintiff may obtain an extension of his employment on a yearly basis if "unusual circumstances" warrants such a continuance, fails to evidence a significant property interest so that procedural due process protections will attach. See *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct.

cause of action predicated on the Equal Protection Clause of the Fourteenth Amendment was set forth in plaintiff's complaint and therefore allowed the parties to proceed on that issue.

Subsequently on January 20, 1977 defendants filed a motion for summary judgment with respect to the equal protection claim, together with an affidavit of Ray T. Fortunato, Assistant Vice President for Personnel Administration at The Pennsylvania State University, in support of the motion. Plaintiff in turn has filed a brief in opposition to defendants' motion for summary judgment, accompanied by 14 affidavits in support of his position. Accepting plaintiff's averments as true and viewing all inferences to be drawn from the underlying facts contained in the pleadings and related documents in the light most favorable to plaintiff, for the reasons stated hereinafter we nevertheless conclude that no genuine issue as to any material fact upon which the resolution of this action depends has been raised. Accordingly, defendants are entitled to judgment as a matter of law.

 As a preliminary matter, defendants have filed a motion to strike the affidavits submitted by plaintiff and Fred Speaker on behalf of plaintiff in the above-captioned case. We find plaintiff's affidavit, which sets forth his personal circumstances both prior to and following his forced retirement from the faculty at the Capital Campus of Penn State, to be relevant to the rational relation test of Penn State's mandatory retirement policy under our equal protection inquiry and therefore admissible under Rule 402, Federal Rules of Evidence. In light of the fact that the position of the American Medical Association has been set forth in the affidavit supplied by Dr. James Sammons, Executive Vice President of the A.M.A., and a far better and more appropriate representative

---

2074, 48 L.Ed.2d 684 (1976). Once plaintiff attained his 65th birthday, the effective age of the applicable mandatory retirement policy, he had no reasonable expectation of continued employment at Penn State absent the existence of clear and convincing unusual circumstances indicating such extension is necessary for the effective and efficient operation of a Penn State function or program, which are not apparent in the instant case. In both *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) and *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (decided February 22, 1977) (dissenting opinion of J. Stevens), cases relied on by plaintiff in support of his "property interest" contention, the employees were not subject to removal from their positions and had an entitlement to continued employment unless Kennedy's termination was for a cause which would "promote the efficiency of the service", or unless Velger was unable to rebut the charges leveled against him, respectively. The Supreme Court in *Arnett v. Kennedy* found and Justice Stevens in his dissenting opinion to *Codd v. Velger* unsuccessfully argued that these conditions evince sufficient property interests in continued employment as to invoke the protections of the Due Process Clause. Plaintiff in this case, however, has only a minimal hope of the possibility that he will be retained for a second extension of one year, after attaining the age of mandatory retirement, to promote the efficient operation of an academic program; plaintiff, on the other hand, has a substantial expectation of being retired. Under these circumstances, Plaintiff clearly has no supportable claim of *entitlement*

to continued employment such as would constitute a property interest for due process purposes. At best it can be said that he has a claim only to the right to be considered for an extension, which ostensibly is a decision regarding the best interests of the University and which fails to evidence a sufficient entitlement to a benefit requiring observance of attendant due process procedures.

Moreover, to the extent that plaintiff is attempting to raise a substantive due process claim in this regard, we refer him to the recent Supreme Court decision in *Bishop v. Wood, supra,* 426 U.S. at 350, 96 S.Ct. at 2080, 48 L.Ed.2d at 693 where the Court explicitly stated that it is improper for the federal court to serve as a forum for the review of the propriety of daily, routine personnel decisions made by defendants in the exercise of their wide discretion in such matters, absent such a patent abuse of discretion as would implicate plaintiff's constitutional rights. Defendants' decision to retire plaintiff pursuant to the mandatory retirement policy, and after only one extension of one year had been granted, does not appear to be motivated by a desire to curtail or to penalize the exercise of his constitutionally protected rights, and no argument to that effect has been made beyond the unfounded contention that plaintiff has a property interest in continued employment. Thus, the existence of an arbitrary and capricious decision which is sufficient to invoke substantive due process protections is not evident in this case.

of the A.M.A.'s position than is Mr. Fred Speaker, the Speaker affidavit should be stricken as inadmissible. Accordingly, defendants' motion to strike will be granted in part.

■ In view of the fact that plaintiff's suit does not call into question the validity, under equal protection of the law principles, of a statute or regulation enacted or promulgated by the State, this court is confronted with the threshold question as to the existence of the necessary state action required under both the fourteenth amendment and § 1983. Based on the recent Third Circuit opinion in *Braden v. University of Pittsburgh*, 552 F.2d 948 (decided March 11, 1977), we conclude that The Pennsylvania State University (Penn State) has sufficient nexus with the State to constitute the requisite state action. Cf. 24 P.S. § 2531 *et seq.*

■ The mandatory retirement policy adopted and effectuated by defendants is clearly subject to the less strict test of rationality under the two-tier equal protection model. The strict scrutiny test, requiring a compelling state interest to uphold the validity of the policy, is required only when the challenged classification impermissibly interferes with exercise of a fundamental interest or operates to the peculiar disadvantage of a suspect class. In this instance the right to employment with a State university cannot be construed to be a jeopardized "fundamental interest" for purposes of equal protection analysis, nor can the class of the faculty and staff of a State university over the age of 65 be said to historically be the subject of purposeful and discriminatory treatment constituting them a suspect class within the meaning of the equal protection clause of the fourteenth amendment. Cf. *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). Our inquiry in this case, therefore is directed to whether or not the age 65 classification for the retirement of employees of a State institution of higher education is rationally related to furthering a legitimate state interest.

In considering this question, however, it is incumbent upon the court only to decide whether the mandatory retirement policy at issue denies plaintiff equal protection under the law and violates the protection afforded under the fourteenth amendment; we are not called upon to address the wisdom of the policy or to assess the effectiveness and desirability of the policy in light of its stated objectives. Affidavits submitted by plaintiff; Cyril Brickfield, legal counsel to the National Retired Teachers Association and the American Association of Retired Persons; Dr. James Sammons, Vice President of the American Medical Association; Bernard Greenberg, Assistant Director of the Insurance, Pensions and Unemployment Benefit Department of the United Steelworkers of America; Robert C. Benedict, Commissioner to the Office for the Aging, Pennsylvania Department of Public Welfare; Leonard Cain, of the Institute of Aging at Portland State University, and Margaret Kuhn, National Convenor of the Gray Panthers amply describe the impact which forced, premature retirement has on society and particularly on the individual. While we are mindful of the devastating effect which compulsory retirement can have on the self respect and economic position of the individual, and while we realize as well that society is often times thereby deprived of a valuable human resource, our inquiry is complete once we determine that the challenged policy is *"rationally related"* to a legitimate state interest.

In this instance the objective purportedly furthered by the mandatory retirement policy of Penn State is the following:

"[T]he University's fundamental responsibility is to provide programs of instruction, research and public service and thus act as an instrument of self-renewal and development for the Commonwealth. To meet this responsibility, it is essential that the University promote and maintain excellence of performance by its faculty and staff." (Fortunato Affidavit.)

The mandatory retirement policy ostensibly is directly related to this institutional objective of maintaining the quality of faculty and staff, and is intended to further this interest in the following ways:

"(1.) Mandatory retirement, as compared with retirement purely at the discretion of the individual employee, or alternatively, by means of individual determinations . . . occurring at random times, permits the University to plan for staffing needs because it provides the University with the ability to make assumptions as to the employees' availability in the work force. Because employment and promotion decisions can be made on the basis of this assumption, the ongoing obligations of teaching, research and public service can be planned for and thus continue uninterrupted by the retirement of employees.

(2.) Retirement creates job opportunities for present and new employees. With respect to present employees, retirement of more senior faculty and staff permits promotions to the vacated positions. Thus, mandatory retirement assists in retaining highly skilled personnel by assuring the existence of promotional opportunities at foreseeable times, rather than as random and unpredictable occurrence. Moreover, the University can adequately plan, well in advance, employee development and training programs to adequately prepare employees to fill the vacated positions.

Mandatory retirement also enables the University to plan for the employment of new personnel with newer disciplines and modern skills, in order to expand and update the institution's human resources, and thus continue to meet new challenges in the University's basic missions of teaching, research and public service.

(3.) It is the University's obligation to respond to changing needs of its students and the society. It is occasionally necessary, therefore, to reallocate institutional resources to new endeavors. Where this reallocation requires a reduction in the size and scope of a University program, including elimination of personnel, mandatory retirement permits such reductions in a planned and foreseeable manner.

(4.) An essential element in maintaining high levels of performance by University faculty and staff is a work force that views its employer as being cognizant of personal needs and desires and as having personnel policies which are fairly and impartially administered. A mandatory retirement policy furthers these objectives in several ways. First, an individual determination of an employee's ability to continue work beyond a certain age is by its nature a difficult and emotional process. It would of necessity require employees to allege and establish that other employees were no longer meeting the standards of performance required for their occupations or professions. The effect of this process on all parties involved would be extremely harmful to the morale and self-respect of employees.

Mandatory retirement also enables individuals to plan for their withdrawal from the work force. Since it is obvious that withdrawal must come at some point as they grow older, a fixed date fosters sound and reasoned planning for this major change in life style.

Finally, mandatory retirement permits changes in University programs without unduly disrupting the individuals involved. Thus, for example, reductions in programs may be keyed around retirements, rather than requiring layoffs. The ability to use mandatory retirement for this purpose clearly enables the University to maintain employee morale and support for the institution . . . .." (Fortunato Affidavit.)

■ It is our firm belief that the promotion and maintenance of the excellence of performance by the faculty and staff of Penn State is a legitimate and laudable objective in formulating and administering a mandatory retirement policy. The apparent thrust of defendants' argument, however, is that the policy is not rationally related to this stated objective and that the numerous affidavits submitted on behalf of plaintiff raise a substantial factual issue in this regard. We disagree.

The mandatory retirement policy has been identified by defendants as being ra-

tionally related to the objective of maintaining the excellence and continuity of faculty and staff at Penn State in several ways. The policy permits Penn State to make certain assumptions as to the future staffing needs and thereby allows the University to maintain a continuous, planned educational program. The ability to anticipate the retirement of its employees not only enables Penn State to prepare for the concomitant promotions and hiring which will be required (or for the reduction or reallocation of the staff, if necessary, in a manner which is not disruptive to the academic program), but also affords both the qualified individuals and Penn State the opportunity to plan the specific training programs of benefit for the new openings. Moreover, the policy provides a uniform, foreseeable retirement date which fosters the motivation of younger employees and allows the older employees to secure other employment or plan for the major changes involved in retirement.

These are beneficial effects of mandatory retirement policies which have been recognized and accepted by other courts. In *Cannon v. Guste*, (E.D.La.Civ. No. 77–3211) (decided May 5, 1975 by the court sitting as a three-judge court), *aff'd*, 423 U.S. 918, 96 S.Ct. 257, 46 L.Ed.2d 245 (1975), the court satisfied itself that there was a rational basis for maintaining a mandatory retirement requirement for Louisiana State Civil Service employees at age 65 in that it is both "fairly and substantially related to the state's valid economic objective of maintaining our efficient, vigorous and healthy civil service, and of establishing a feasible system for promotions of younger employees." While expressed in terms of economic ends, the court nevertheless recognized that the plan facilitated the effective functioning of the civil service and provided for the systematic promotion of younger employees.

Similarly in *Talbot v. Pyke*, 533 F.2d 331 (6th Cir. 1976), the court upheld the constitutionality of a mandatory retirement policy adopted by the Cleveland Metropolitan Park District, a political subdivision of the state of Ohio. In disposing of the challenge to the system on equal protection grounds, the court referred to the Senate Report made in connection with the institution of a mandatory retirement age for the United States Civil Service which found that employees who continued to work beyond their usefulness and draw a salary are in effect pensioners to the full amount of their salary, which deprives the public of an economic and efficient civil service. The court also quoted from an affidavit of a member of the Industrial Relations Association of Chicago which attested that mandatory retirement plans are essential to effective manpower planning, enabling systematic advancement and training of personnel and thereby promoting motivation. Mandatory retirement plans, by providing an expectation of foreseeable upward mobility in the organization, also help to achieve continuity through the retention of key personnel. Moreover, the affidavit noted that such policies constitute a fair and just procedure, providing a standard policy which establishes definite time frames for planning advancement and eventual retirement.

Therefore, the interests relied on by defendants in this case in large part have been previously recognized by federal courts as valid and legitimate interests of the State in maintaining mandatory retirement policies in other occupations. We believe that from the record in its entirety it appears clear that no substantial question of fact as to the integrity and design of the mandatory retirement policy adopted by Penn State èxists in this case. Moreover, we further conclude that plaintiff has raised no genuine issue as to whether the specific policy of Penn State as it concerns faculty and staff in particular is rationally related to the legitimate state interests advanced by Penn State. The wisdom, and to some extent the effectiveness, of the policy may have been questioned by various authorities in their affidavits, but the fact that such policies serve to help order and facilitate the administration of personnel in large organizations for the efficient and competent operation of the program, at whatever expense, remains certain.

Many of the affidavits submitted on behalf of plaintiff in this case explore, in general terms, the reasons why mandatory retirement plans allegedly do not further the objective of maintaining the excellence and continuity of the Penn State faculty and staff. Gene Fisher, Staff Representative for the United Steelworkers of America Older and Retired Workers Department, emphasizes that the life expectancy, and the role of older citizens in our society, has changed in the past decades in arguing that older members of the work force remain capable of improving their methods and abilities and constitute a valuable human resource. Greenberg and Michael Batten, Director of Programs in Industrial Gerontology for Kirschner Associates in Washington, D.C., also contend that older faculty and staff have greater experience and ability in a vocation in which it is possible to carry on one's duties to an extended age. Moreover, both Greenberg and A. J. Jaffe, Director of the Manpower and Population Program of the Bureau of Applied Social Research at Columbia University, propose that despite their age, employees over the age of 65 are more reliable in that they are more settled and serious workers with less likelihood to move from organization to organization seeking advancement.

At the same time, however, several affiants suggest that a mandatory retirement policy at age 65 is illogical and unnecessary since the median age of retirement is 63 and because few employees will elect to continue working or will otherwise be capable of continuing to work for very long after age 65. See affidavits of Fortunato; Brickfield, Sheppard, Director of the Center on Work and Aging of the American Institutes for Research in Washington, D.C.; Dr. Sammons and Kuhn. Therefore, while in some instances individuals over 65 years of age may constitute an available human resource, in most cases it appears that they will either be unwilling or unable to continue in a vigorous, full-time capacity for an appreciable period of time and it does not appear unreasonable to impose retirement on employees at that age as a standard policy. Therefore, we do not find the argument that individuals over the age of 65 constitute a valuable, available human resource to be persuasive in the context of considering the rationality of the mandatory retirement policy at Penn State.

Moreover, this circumstance is also responsive to those critics of the mandatory retirement policy because it allegedly both arbitrarily and capriciously imposes retirement at age 65. While it is true that there is no universal age of retirement and, to that extent, any classification in this respect would appear arbitrary in certain instances, the choice of the age 65 as the appropriate retirement age conforms generally to the average actual or expected age of retirement, promotes in many respects the desired objectives of the mandatory retirement policy and is not in fact either arbitrary or capricious. As pointed out by Brickfield, only seven percent of *all* retirees are both willing and able to continue working; "It seems fair to say that within the University community, virtually every job created because of mandatory retirement would today be open were the rule abolished."

Fisher, in his affidavit, further maintains that to the extent that mandatory retirement policies create new employment opportunities for the younger workers, they at the same time create a new class of unemployed in those over the age of 65. Sheppard reiterates this thought and both he and Greenberg attest that there is in fact no documented proof that mandatory retirement plans create new jobs for the young, while it is clear that premature retirement does create new funding problems for pensions and imposes additional burdens on the remainder of the working population to support the retired. Brickfield also maintains that the retirement of senior persons often creates vacancies which cannot be filled by the unskilled unemployed and that, as a result, greater costs must be incurred to meet the competition and to hire or promote skilled workers. Dr. Sammons indicates that employers might even be compelled to hire less capable workers, or spend greater amounts of money to properly train them.

Brickfield contends that those jobs made available by compulsory retirement would in any event be made available by voluntary retirement within the near future. The existence of the policy, however, affords Penn State the benefit of anticipating this event and its timing, of formulating certain assumptions as to the University's future personnel needs, and of providing for those needs in advance. Sheppard and Greenberg, however, suggest that the absence of proof that mandatory retirement policies create new job opportunities indicates that, indeed, none are created. No proof is offered, however, to show that no new opportunities are the result of retirements pursuant to a mandatory retirement policy. It is a fair assumption that in the absence of a planned reduction in the size of the staff, the retirement of a senior employee will create a new opportunity for a series of promotions and the hiring of a new individual, or an opening which is to be filled by an experienced and younger replacement. In either case new employment and promotion opportunities for younger workers are created throughout the employment market. The gist of the affiants' argument is that these new opportunities should not be at the expense of potential employees over age 65, which questions a *policy decision* unrelated to the narrow question as to whether Penn State's mandatory retirement policy is rationally related to a legitimate state interest once it is determined that the age 65 classification is reasonable and that the policy creates new employment and promotion opportunities, and therefore furthers an advocated State interest.

In support of the contention that mandatory retirement policies are not beneficial, the affiants also cite the new costs and additional burdens which must be borne in creating a bigger class of pensions and in properly training replacements. The training programs would be eventually necessary even if a mandatory retirement policy was not in effect, and in this way the programs can be arranged and implemented beforehand as the retirement of an employee becomes imminent. The additional cost which will be incurred may be a disadvantage which will have to be endured in accepting the other advantages of a mandatory retirement policy, but this factor is no reflection on the relation of the policy to the maintenance of the quality of Penn State's faculty and staff and the manner in which the adopted policy furthers that objective.

Finally, many of the affidavits submitted on behalf of plaintiff indicate that better and more suitable alternatives to the mandatory retirement policy may exist which will fulfill Penn State's stated objectives in retaining such a policy. See affidavits of Brickfield, Fisher, Greenberg, Benedict, Jaffe, Sheppard, Batten, Kuhn and Cain. The affiants maintain that the capability and competency of each employee should be the criteria for the decision whether to retain, fire or retire any employee, regardless of his or her age, sex or other personal characteristics. They contend that individual decisions should be made upon consideration of each employee's situation and in light of their personal needs and demands. While the potentially disruptive consequences of individual determinations may be avoided by establishing a mandatory retirement policy, the affiants argue that such policies impose a rigid timetable without compromise and ignore the individual differences and human rights of each employee for the mere sake of administrative convenience.

Several of the affiants further argue that similar individual decisions must already be made concerning hiring, promotion and tenure policies, and suggest that in time an expertise in making retirement decisions could readily be developed. Kuhn points out that new criteria have already been developed by which to adjudge the individual competence of employees, which together with medical reports could be guides to retirement determinations. Fisher suggests that individual selective decisions could be made in compulsory annual contract agreements (collective bargaining agreements) voluntarily entered into by each employee, rather than by an adminis-

trator. In either event Batten maintains that the existence and success of other retirement systems proves that mandatory retirement policies are not essential to the effective operation of an organization and maintenance of a qualified staff. The affiants are agreed that the administrators of the personnel at Penn State should not shirk their responsibilities and sacrifice the individual rights of the employees simply to ease their administrative duties.

Again, neither the wisdom of adopting a mandatory retirement policy nor the availability of better alternatives is relevant to our inquiry today. Provided that Penn State's policy is rationally related to the stated objective of maintaining the excellence of the faculty and staff, it is immaterial that some individual differences may be sacrificed or ignored, or that more accommodating alternatives may be overlooked. It is sufficient that the mandatory retirement policy serves to make future personnel needs somewhat predictable, creates employment and promotion opportunities for younger employees, helps to allocate personnel to areas of need, and presents a recognized policy of retirement which treats each employee impartially and which affords him sufficient notice to enable him to prepare for retirement. The fact that the policy may in certain instances result in seemingly harsh decisions, oblivious to individual capabilities, needs and demands, does not alter the fact that all employees are treated equally and fairly. Where a decision pursuant to the mandatory retirement policy would in effect undermine the very objectives for which the policy was instituted, the policy further provides that one-year extensions of employment may be granted for up to five years for the purpose of maintaining the effective and efficient operation of a Penn State program. Plaintiff in this case did receive one extension and based on the record before us there is no reason to believe the refusal to further extend his employment was based on constitutionally impermissible grounds or was otherwise arbitrary and capricious. See n. 2, *supra*.[3]

While the mandatory retirement policy adopted by Penn State may not be the wisest, best and most beneficent scheme for achieving a high quality of excellence in its faculty and staff, that is not to say that the policy does not rationally further this objective which has been advanced by defendants. To show that the policy has its disadvantages and may even be undesirable in the face of reasonable alternatives is not to raise a genuine issue as to whether the policy does help to maintain the quality of the faculty and staff at Penn State in various enumerated ways. When subject to the test of rationality, a state "does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect." *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491, 501–502 (1970); *Massachusetts Bd. of Retirement v. Murgia, supra,* 427 U.S. at 314–317, 96 S.Ct. at 2567–2568, 49 L.Ed.2d at 526–527. We decide only that the mandatory retirement policy adopted by Penn State does not deny plaintiff equal protection of the law within the meaning of the Fourteenth Amendment and § 1983.

For these reasons, and for the reasoning set forth in *Rubino v. Ghezzi,* 512 F.2d 431 (2d Cir. 1975), we also conclude that the claims brought in this court concerning the constitutionality of Penn State's mandatory retirement policy do not raise a substantial federal question within our jurisdiction under 28 U.S.C. § 1331. Accordingly, defendants' motion for summary judgment will be granted.

An appropriate order will be entered.

---

**3.** Based on the affidavits submitted by Oliver C. LaGrove, a former instructor at the Capital Campus of Penn State, and Daniel Schulder, Special Assistant to the Governor for Aging, it appears that the only questionable, unsupported decision which was made by defendants in connection with the mandatory retirement policy and with respect to plaintiff was the decision to grant him a one-year extension in employment for the 1975–1976 academic term after what appeared to be a final decision to retire plaintiff had been made.