Stefan ISSARESCU

v.

Max CLELAND et al.

Civ. A. No. 78–0330.

United States District Court,
D. Rhode Island.

Feb. 21, 1979.

Richard A. Licht, Providence, R. I., for plaintiff.

Robert Gammell, Asst. U. S. Atty., Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

Dr. Stefan Issarescu is a seventy-two year old pathologist at the Veterans Administration (V.A.) Hospital at Davis Park in Providence, Rhode Island. Still being able and eager to continue his work at the V.A. hospital, Dr. Issarescu questions the constitutionality of 5 U.S.C. § 8335, the statute which mandated his retirement at age seventy.

It is of little comfort to Dr. Issarescu that Congress has since eliminated mandatory Civil Service retirement by enacting the Age Discrimination in Employment Act Amendments of 1978 (ADEA). These amendments only became effective as of May 31, 1978. Because Dr. Issarescu reached age seventy before that effective date, he is governed by prior law and cannot take advantage of the ADEA.

Confining himself to the prior statutory framework, Dr. Issarescu asserts that the Civil Service was arbitrary in denying him an exemption from mandatory retirement. In the alternative, he argues that the mandatory retirement provisions of 5 U.S.C. § 8335 violate the principles of equal protection embodied in the fifth amendment of the United States Constitution.

Dr. Issarescu is a pathologist of undisputed ability who has been employed at the Davis Park Hospital since 1960. In July 1976, Issarescu received notice that he would be mandatorily retired as of his seventieth birthday, October 5, 1976. Upon Issarescu's request, J. P. Travers, the director of Davis Park Hospital, requested that the Veterans Administration exempt the plaintiff from mandatory retirement. This request was denied. Such a denial is totally within the discretion of the appointing authority. 5 U.S.C. § 8335. Even if the person is qualified to continue his employment, the appointing authority need not grant a retirement exemption. Such decisions are within the agency's "own discretion, judgment and policy. And since an agency thus has the absolute right to not do any of these things, its not-doing of any or all of them is without any basis for legally constituting or being examined as administrative arbitrariness". *Gamble-Skogmo, Inc. v. Federal Trade Commission,* 211 F.2d 106, 112 (8th Cir. 1954).

Despite the denial of a retirement exemption, Dr. Issarescu remained eager to work and Davis Park Hospital continued to need his services. Issarescu, after some negotiation, agreed to serve as a reemployed annuitant pursuant to 5 U.S.C. § 3323. As an "annuitant", Issarescu's terms of employment were held on a year to year and, later, on a month to month basis. In order to become a reemployed annuitant, Issarescu filed the necessary forms for official retirement on October 31, 1976.

There are no allegations that Dr. Issarescu was deceived or coerced into filing these official retirement forms. Although Dr. Issarescu must be viewed as having retired voluntarily, he cannot be considered to have taken this step happily. After a vain attempt to obtain a retirement exemption, Issarescu found that formal retirement was the only bureaucratic method by which he could remain employed at Davis Park Hospital. Issarescu was faced with a grim Catch-22-like situation: either refuse to retire from one's life profession and spend one's time in court attempting to regain one's former position, or retire "voluntarily" and continue to work in the exact same position as an "annuitant" at the discretion of the Hospital.

There is no dispute that Issarescu continues, without any break in service, to perform all the duties of a staff pathologist. His salary effectively remained at the same level. Nor is there any dispute that Issarescu was retired, solely because of his age; his competence as a doctor remains undisputed.

In April, 1978, the plaintiff was notified of the recently enacted ADEA. He was also advised that the Civil Service would continue to entertain requests for exemptions from mandatory retirement under the old law until the effective date of ADEA (September 30, 1978). Spurred by this information, Dr. Issarescu again asked Davis Park Hospital to request, on his behalf, an exemption from mandatory retirement. This time the Hospital refused to make such a request.

On May 31, 1978, plaintiff received notice that his employment at the Davis Park Hospital was to be terminated on June 30, 1978. The Hospital apparently had succeeded in hiring two younger pathologists and had little continued need for Issarescu. However, Issarescu obtained a temporary restraining order and a preliminary injunction that assured his continued employment as a staff pathologist. This Court now reaches the merits of Issarescu's claim.

One must fell true and heartfelt sympathy for the plight of Dr. Issarescu. However, sympathy and legal entitlement are vastly different things. Congress was swayed by the concerns of elder federal employees and passed the ADEA. Yet, Congress decided not to apply the amendments retroactively. This was a policy judgment to which the Court must adhere. Those mandatorily retired prior to the effective date of the amendments must be considered legally retired. Those subsequently hired as "annuitants" legally must be considered employed on a temporary and discretionary basis. For the reasons set forth below, the Court must conclude that plaintiff's employment was properly terminated.

Plaintiff asserts that authorities at Davis Park Hospital terminated his employment prior to September 30, 1978 solely to assure that he could not possibly benefit from the ADEA. Issarescu argues that such a termination was arbitrary and capricious. There is no evidence to support this contention. Nor can any such inference be drawn from the facts in this case.

█ Even though Issarescu retained all his previous duties, he was unmistakably a reemployed annuitant whose employment was continued on a month to month basis. Being employed only on a month to month basis, it was solely within the Hospital's discretion to rehire Issarescu at the end of each month. The applicable statutory provision, 5 U.S.C. § 3323(b), specifically states that "an annuitant so reemployed serves at the will of the appointing authority". Having arranged to hire two younger pathologists, the Hospital no longer needed plaintiff. Terminating plaintiff for this reason is not an abuse of discretion, even if plaintiff's age was a major factor in the decision.

█ Dr. Issarescu also attacks the constitutionality of the mandatory retirement provision in 5 U.S.C. § 8335 which was in force prior to the ADEA. Even if his position as a rehired annuitant could be validly terminated at the Hospital's discretion, plaintiff argues, the law which forced him to become a rehired annuitant is unconstitutional. Most properly, Dr. Issarescu should

have attacked the constitutionality of the statute at the time he was mandatorily retired. Instead, Issarescu understandably decided to continue with his duties at Davis Park instead of launching a legal battle against the Civil Service and hospital officials. The reasons for delaying an attack upon the statute are justifiable and the length of delay is relatively slight; therefore, this Court finds that plaintiff has not waived his right to test the constitutionality of the statute. *Compare Providence Journal v. F. B. I.,* 460 F.Supp. 778 (D.R.I.1978). There is no question that plaintiff has suffered injury-in-fact from the functioning of the statute and, therefore, has standing to attack it. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

Dr. Issarescu's constitutional challenge to the 5 U.S.C. § 8335's mandatory retirement provision must fail. In *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), the Supreme Court held that a statute which classifies on the basis of age need only meet "the rational-basis standard". Thus, in scrutinizing 5 U.S.C. § 8335, this Court

> employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary. . . . Such action by a legislature is presumed to be valid.

*Id.* at 314, 96 S.Ct. at 2567. Utilizing this standard, the United States Supreme Court upheld a Massachusetts statute which required state police to retire at age fifty. Although there are superficial differences, the federal statute requiring a civil servant to retire at age seventy appears to employ classifications that are equally rational and valid.

In order to satisfy the "rational basis standard", the state's classification must rationally further the purpose "identified by the State". *Massachusetts Bd. of Retirement v. Murgia, supra* at 314, 96 S.Ct. 2562. *See also San Antonio Schl. Dist. v. Rodriguez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Congress identified several general purposes in passing the mandatory Civil Service retirement provisions. Mandatory retirement would eliminate older people who were in general less efficient than younger people. The mandatory provisions set a uniform age maximum to insure equal treatment [1] and to avoid embarrassing and time consuming senility hearings. And, most importantly, mandatory retirement insured that younger people would be afforded advancement opportunities and thereby be encouraged to enter or continue government employment. Senate Report No. 99, 66th Cong., 1st Sess. 2, 3 (1919); 59 Cong. Rec. 2501–250, 6290–6291, 6295, 6297 (1920). Congress also provided retirement benefits for those employees mandatorily retired. The mandatory retirement provision unquestionably is a rational and effective measure to achieve the Congressional goal of an efficient, enticing, and highly qualified civil service.

Congress recognized that some seventy year old civil servants would still be very efficient and highly motivated. Yet, individualized hearings were considered too inefficient and cumbersome. As Congressman Lehlbach stated:

> Of course, there must be some limit. You cannot legislate so that every single instance in over 300,000 employees can be taken care of, but you can use your judgment and try to legislate so that the great bulk of them will be properly included.

59 Cong.Rec. 6371. Congress faced the legislative necessity of line drawing and rationally concluded that the benefits of re-

---

1. This is not a case where Congress designated different mandatory retirement ages for different groups of civil servants. Such a legislative scheme has been struck down as arbitrary. *See Bradley v. Vance,* 436 F.Supp. 134 (D.D.C.

1977) (requirement that Foreign Service Officers retire at age 60 was arbitrary when compared to 70 year age limit on other federal employees).

quiring retirement at age seventy outweighed any specific case of injustice that such a rule might foster. This legislative judgment undoubtedly was constitutional; as the Supreme Court has stated:

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis", it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality". *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369.

*Dandrige v. Williams, supra* 397 U.S. at 485, 90 S.Ct. at 1161.

The fact that Congress has now changed its mind and abolished the mandatory retirement provision does not affect the rationality and constitutionality of the previous legislative decision. On the contrary, the recent amendments emphasize that Congress is the body with the peculiar expertise and constitutional responsibility to gauge the current needs of society, to reassess past decisions, and to reevaluate previous political and moral sentiments. As one federal court explained:

> There is no question but that the passage of the 1978 amendments to the Age Discrimination in Employment Act was the result of a process that was fair, deliberate, and well informed. Moreover, Congress has provided a mechanism for continually reassessing the effects and the wisdom of its actions on this issue. The superior ability of Congress to collect data and to resolve competing social goals, as well as the flexibility resulting from its ability to monitor the effects of its actions and to make adjustments accordingly, mark this issue as one which the Constitution has appropriately left to the legislative processes, both state and federal.

*Palmer v. Ticcione,* 576 F.2d 459, 465 (2d Cir. 1978), *cert. filed,* 47 U.S.L.W. 3109 (8/11/78) (No. 78–240). The recent amendments may be more in keeping with our current concerns, sentiments, and morality; yet, despite their occasional harsh effect, the prior legislative scheme cannot fairly be termed irrational.

Recent decisions have utilized similar rationales to uphold the constitutionality of 5 U.S.C. § 8335 and similar mandatory retirement provisions. A district court, confronted with another constitutional challenge to 5 U.S.C. § 8335, reluctantly dismissed the challenge for want of a substantial federal question. *Weisbrod v. Lynn,* 383 F.Supp. 933 (D.D.C.1974) *aff'd,* 420 U.S. 940, 95 S.Ct. 1319, 43 L.Ed.2d 420 (1975). More recently, however, both the Supreme Court and many circuit courts have found that mandatory retirement statutes present significant constitutional questions. *See, e. g., Massachusetts Bd. of Retirement v. Murgia, supra.* Yet, hardly any of these constitutional challenges have succeeded. The Second Circuit has upheld the constitutionality of state laws that required the retirement of tenured civil servants at age seventy, *Johnson v. Lefkowitz,* 566 F.2d 866 (2d Cir. 1977); the mandatory retirement of state judges at age seventy, *Rubino v. Ghezzi,* 512 F.2d 431 (2d Cir.), *cert. denied* 423 U.S. 891, 96 S.Ct. 187, 46 L.Ed.2d 122 (1975); and the mandatory retirement of state teachers at age seventy, *Palmer v. Ticcione, supra.* Other federal courts have readily upheld similar retirement statutes. *See, e. g., Klain v. Pennsylvania State University,* 434 F.Supp. 571 (M.D.Pa.1977) (mandatory retirement for state university faculty); *Cannon v. Guste,* Civ. No. 77–3211, (E.D.La. 5/5/75), *aff'd* 423 U.S. 918, 96 S.Ct. 257, 46 L.Ed.2d 245 (1975) (mandatory retirement of state civil service).

Only the Seventh Circuit has struck down a statute that required the mandatory retirement of state teachers at age sixty-five. *Gault v. Garrison,* 569 F.2d 993 (7th Cir. 1977). The Seventh Circuit distinguished the Supreme Court's decision in *Murgia* on the basis that it concerned the mandatory retirement of a group (uniformed state police) which was required to maintain physical preparedness. The Sev-

enth Circuit found no rational reason for the legislature to relate advancing age to the mental fitness to teach. This Court declines to follow the Seventh Circuit's reasoning. The district court opinions and the Supreme Court's summary affirmances in both *Weisbrod v. Lynn, supra,* and *Cannon v. Guste, supra,* never distinguished between those civil servants whose occupations primarily involved mental skills and those who primarily relied upon their physical abilities. The Seventh Circuit is too quick to assume that physical decline is the only rational reason for a mandatory retirement law. The Second Circuit has strongly and persuasively criticized the Seventh Circuit's reasoning:

> Second, *Gault* too narrowly conceives the possible rational bases for a compulsory retirement statute. Unrelated to any notion of physical or mental fitness, a state might prescribe mandatory retirement for teachers in order to open up employment opportunities for young teachers— particularly in the last decade when supply has outpaced demand, or to open up more places for minorities, or to bring young people with fresh ideas and techniques in contact with school children, or to assure predictability and ease in establishing and administering pension plans. A compulsory retirement system is rationally related to the fulfillment of any or all of these legitimate state objectives.

*Palmer v. Ticcione, supra* at 462.

In light of the overwhelming authority supporting mandatory retirement provisions and the rational legislative reasons for establishing such mandatory age limits, this Court upholds the constitutionality of 5 U.S.C. § 8335 and has no alternative but, however sadly, to enter judgment for the defendant.

An Order will be prepared accordingly.