Commonwealth v. Wida

*R. Michael Kaar*, for Commonwealth.
*Leonard R. Apfelbaum*, for defendant.

RANCK, *J.*, June 20, 1979—On January 3, 1979, the Pennsylvania State Police, armed with a search warrant, entered the fire company building of the Americus Hose Company of Sunbury. As a result we have, so far as we can determine, a novel constitutional challenge to the criminal gambling laws of Pennsylvania.

Defendant herein, Michael R. Wida, president of the Americus, was subsequently arrested and charged with violating sections 5512 and 5513 of the Crimes Code of Pennsylvania.[1] At the hearing

---

1. 18 Pa.C.S.A. §5512. Lotteries, etc.

"(a) Status of activity.—All unlawful lotteries or numbers games are hereby declared to be common nuisances. Every transfer of property which shall be in pursuance of any unlawful lottery or numbers game is hereby declared to be invalid and void.

"(b) Offense defined.—A person is guilty of a misdemeanor of the first degree if he: (1) sets up, or maintains, any lottery or numbers game; (2) manufactures or prints, or sells, exposes for sale or has in his possession with intent to sell any unlawful lottery or numbers ticket or share, or any writing, token or other device purporting or intending to entitle the holder or bearer, or any other person, to any prize to be drawn or obtained in any lottery, or numbers game; or (3) publishes any advertisement of any lottery or numbers game.

"(c) Status of purchaser.—The purchaser of any such ticket, or device, shall not be liable to any prosecution or penalty arising out of this crime, and shall in all respects be a competent witness to prove the offense.

before this court on defendant's omnibus pretrial motion, Mr. Wida admitted that the Americus conducts gambling on its premises. Defendant openly stated that he was aware that punch boards, lottery stamp machines, and other gambling devices, the possession of which are prohibited by Pennsylvania's gambling laws, were maintained on the premises of the Americus Hose Company. However, defendant contends that these statutes are unconstitutional under both the Pennsylvania and United States constitutions.

This court has been the subject of both a demonstration outside the courthouse and much superfluous testimony on the part of defendant. However, the feelings of the members of the Americus

---

"(d) Definition.—As used in this section the term 'unlawful' means not specifically authorized by law." December 6, 1972, P.L. 1482, sec. 1, effective June 6, 1973.

18 Pa.C.S.A. §5513. Gambling devices, gambling, etc.

"(a) Offense defined.—A person is guilty of a misdemeanor of the first degree if he: (1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards; (2) allows persons to collect and assemble for the purpose of unlawful gambling at any place under his control; (3) solicits or invites any person to visit any unlawful gambling place for the purpose of gambling; or (4) being the owner, tenant, lessee or occupant of any premises, knowingly permits or suffers the same, or any part thereof, to be used for the purpose of unlawful gambling.

"(b) Confiscation of gambling devices.—Any gambling device possessed or used in violation of the provision of subsection (a) of this section shall be seized and forfeited to the Commonwealth. All provisions of law relating to the seizure, summary and judicial forfeiture, and condemnation of intoxicating liquor shall apply to seizures and forfeitures under the provisions of this section." December 6, 1972, P.L. 1482, sec. 1, effective June 6, 1973.

and other volunteer fire companies as to the in-equity of the gambling laws are not without merit. The outstanding public service performed by this organization is well known. It is unfortunate, how-ever, that attention has been diverted from the real issue. Whether Pennsylvania's gambling laws are good or bad, fair or unfair, popular or unpopular, are issues for the legislature, and not this court, to decide. If the public is opposed to Pennsylvania's gambling laws in their present form, the legislature has the power to make the necessary changes. The power of this court is limited to the narrow issue of determining whether these laws pass constitu-tional muster. Although we sympathize with these volunteer firemen, we have a duty to interpret the law without being influenced by outside consid-erations. We will deal with each of defendant's claims separately in addressing this question.

## I. VAGUENESS

Defendant contends that both 5512 and 5513 are unconstitutionally vague. The gist of this com-plaint is that the term "unlawful lottery" in 5512, and "unlawful gambling" in 5513 fail to give notice of what conduct is prohibited by these statutes. 5512 defines the term "unlawful" as "not specif-ically authorized by law." Defendant does not view this definition as adequate.

In its classic formulation of the standard for es-tablishing unconstitutional vagueness, the United States Supreme Court held that a penal statute "must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." If "men of common intelligence" must guess at the meaning of a statute, the statute violates due process of law:

Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926). See also Palmer v. City of Euclid, 402 U.S. 544, 91 S.Ct. 1563, 29 L.Ed. 2d 98 (1971); United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed. 2d 561 (1963).

This is not the first time Pennsylvania's gambling statutes have been challenged as unconstitutionally vague. In Com. v. Betres, 237 Pa. Superior Ct. 361, 367, 352 A. 2d 495 (1975), it was asserted that the terms "unlawful gambling" and "unlawful gambling place" in 5513 were unclear. This argument was based on the fact that gambling in itself is not unlawful in Pennsylvania. The Superior Court of Pennsylvania found this contention to be without merit, stating that:

"While the statute in the instant case could be clearer, it is not so vague that we cannot determine what the legislature intended when it used the terms 'unlawful gambling' and 'unlawful gambling place.' The legislature has specifically authorized certain types of gambling such as the state lottery, harness racing, and thoroughbred racing. When the term unlawful gambling was used by the legislature they could have intended no other meaning than gambling not specifically authorized by the Commonwealth." Betres, supra, at 498.

Defendant attempts to minimize the applicability of Betres by pointing to the differing factual situation. In Betres, defendant was gambling for private profit, while in the instant case the Americus conducts gambling for charitable purposes. This distinction is irrelevant. "The word 'gambling' has a commonsense meaning and should be construed accordingly." Com. v. Soychak, 221 Pa. Superior Ct. 458, 466, 289 A. 2d 119, 124 (1972). A person

knows when he is gambling. Also, there is no guesswork required in determining whether the particular form of gambling engaged in is authorized. Thus, there is no need for "men of common intelligence" to guess at the meaning of "unlawful gambling." We, therefore, find that sections 5512 and 5513 of the Pennsylvania Crimes Code are not unconstitutionally vague.

## II. OVERBREADTH

Defendant also asserts that 5512 and 5513 are unconstitutionally overbroad. It is argued that the scope of "unlawful gambling" as defined in these sections includes conduct of defendant and the Americus which is protected by the First Amendment. Defendant claims these sections prevent peaceful and legitimate entities, like the Americus, from utilizing a source of revenue collection.

"It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." Broadrick v. Oklahoma, 413 U.S. 601, 611-612, 93 S.Ct. 2908, 37 L.Ed. 2d 830, 839-840 (1973).

Even a clear and precise enactment may be overbroad if in its reach it prohibits constitutionally protected conduct: Grayned v. City of Rockford, 408 U.S. 104, 114, 92 S.Ct. 2294, 33 L.Ed. 2d 222, 231 (1972); Zwickler v. Koota, 389 U.S. 241, 249-250, 88 S.Ct. 391, 19 L.Ed. 2d 444, 450-451 (1967). Thus, the question we face is whether Pennsylvania's gambling laws sweep within their prohibition

conduct that may not be punished under the First and Fourteenth Amendments.

The scope of statutes that have been declared overbroad has ranged from those that sought to regulate "only spoken words." See Gooding v. Wilson, 405 U.S. 518, 520, 92 S.Ct. 1103, 31 L.Ed. 2d 408 (1972), to those which ensnared the rights of association of innocent organizations. See Keyishian v. Board of Regents, U. of St. of N.Y., 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed. 2d 629 (1967); United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed. 2d 508 (1967). Though defendant has not specifically stated what protected conduct of the Americus is prohibited, we nevertheless will examine these statutes from both ends of the spectrum.

It has long been held that it is not an abridgment of freedom of speech to make a course of conduct illegal merely because the conduct in part is carried out by means of spoken language: Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). Following from this, courts throughout the country have repeatedly held that there is no constitutional right to gamble: Lewis v. United States, 348 U.S. 419, 75 S.Ct. 415, 99 L.Ed. 475 (1955), overruled on other grounds in Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed. 2d 889 (1968). See also Maine State Raceways v. LaFleur, 147 Me. 367, 87 A. 2d 674, 679 (1952); United States v. Matya, 541 F. 2d 741, 747 (8th Cir. 1976). The case of United States v. Matya, supra, is particularly interesting in respect to the case at hand. In Matya, a Nebraska statute, R.R.S. Neb. §28-947 (1943), made it a crime to keep on exhibit "any gaming table, establishment, device or apparatus, to win or gain money." The court

noted that "the overbreadth doctrine, far from being an expansive license by which courts routinely invalidate statutes which might have been drafted with more precision, is a doctrine whose function is limited." Matya, supra, at 747-748. It then concluded that defendants would be hard pressed to argue that any conduct reached by the Nebraska statute could be characterized as free expression. Surely a statute as broad as the Nebraska one would include conduct such as that of the Americus. We, therefore, find that sections 5512 and 5513 of the Pennsylvania Crimes Code in no way impinge upon defendant's, or anyone's, First Amendment rights.[2]

## III. EQUAL PROTECTION

Defendant has placed the greatest emphasis on the claim that 5512 and 5513, in conjunction with the specifically authorized forms of gambling in Pennsylvania, invidiously discriminate against the

---

2. Though not clearly elaborated, defendant seems to suggest that the statutes prevent the Americus from utilizing a source of revenue and thus somehow inhibit the exercise of a First Amendment right. Perhaps this argument would have some cogency if without gambling the Americus would be forced out of existence. However, testimony of defendant established that the Americus presently has four sources of revenue: gambling, bar and grill receipts, memberships, and a contribution from the City of Sunbury. Gambling provides 40 percent of this total. Defendant testified that the Americus could not maintain its present level of service to the community without the *revenue* from gambling. But defendant also stated that no other fund-raising activities are undertaken. Surely there are other ways, as other volunteer fire companies have shown, of raising revenue. It is thus difficult for us to perceive how these statutes affect the Americus' freedom of association in any way.

Americus and other charitable organizations in violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. It is well known that the legislature of the Commonwealth of Pennsylvania has seen fit to carve three exceptions out of the gambling laws. Two of these, the State Harness Racing Act of December 22, 1959, P.L. 1978, 15 P.S. §2601[3] et seq., and the State Thoroughbred Racing Act of December 11, 1967, P.L. 707, 15 P.S. §2651[4] et seq., authorize private corporations to conduct gambling with the Commonwealth to receive a percentage of the gross revenues. The third, the State Lottery Law of August 26, 1971, P.L. 351, sec. 1, 72 P.S. §3761-1[5] et seq., allows the government to conduct gambling with the net revenues to be used for charity. Defendant's complaint is that there is no justifiable basis for distinguishing between these exceptions and the prohibited activities of the Americus Hose Company. In support of this contention, there was testimony as to the indispensable services the Americus provides to Sunbury and surrounding communities, the fact that 100 percent of the revenue of the Americus is used for charitable purposes, and the cost that the citizens of Sunbury would have to bear if it were not for the Americus. This testimony is accepted without dispute and the members of the Americus are to be commended. However, as pointed out earlier in this opinion, it is not the court's prerogative to rule on whether these laws are good or bad, but only whether they are constitutional.

---

3. As amended October 7, 1976, P.L. 1097, sec. 1.

4. As amended June 18, 1976, P.L. 389, sec. 1.

5. August 26, 1971, P.L. 351, sec. 1.

The fundamental principles of equal protection analysis are well established. The Fourteenth Amendment does not deny to states the power to treat different classes of persons in different ways: Eisenstadt v. Baird, 405 U.S. 438, 447, 92 S.Ct. 1029, 31 L.Ed. 2d 349, 358 (1972); McDonald v. Board of Election Commissioners of Chicago, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed. 2d 739 (1969). However, it does "'deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute.'" Eisenstadt, supra, at 358-359.

In applying these principles certain presumptions and tests have been formulated. Legislatures are initially presumed to have acted constitutionally. Thus, their statutory classifications will be set aside only if no grounds can be conceived to justify them: Schilb v. Kuebel, 404 U.S. 357, 92 S.Ct. 479, 30 L.Ed. 2d 502, 510, 511 (1971). The reasons presented to justify the classification are analyzed differently, depending upon the parties classified and their rights affected. If the classification affects what has been recognized as a "suspect class," or if it impinges upon a fundamental right, then the strict scrutiny test of rationality must be applied: Klain v. Pennsylvania State University, 434 F. Supp. 571 (M.D. Pa. 1977).

Under the test of strict scrutiny the state must have a compelling interest for making the classification: Klain, supra.

Neither defendant nor the Americus are members of a suspect class and, as seen in our discussion of overbreadth, no fundamental rights are infringed upon by these statutes. Therefore, the

Commonwealth must merely show that there is some rational connection between the objective of the gambling laws and the distinction made: Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed. 2d 225, 229 (1971); Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed. 2d 92, 101 (1972).

It is a commonly accepted principle that a state has the power to suppress gambling: Marvin v. Trout, 199 U.S. 212, 26 S.Ct. 31, 50 L.Ed. 157 (1905); Ah Sin v. Wittman, 198 U.S. 500, 25 S.Ct. 756, 49 L.Ed. 1142 (1905); Stone v. Mississippi, 101 U.S. 814, 25 L.Ed. 1079 (1879). The settled policy in Pennsylvania has long been opposed to gambling. See Plotnick v. Pennsylvania Public Utility Commission, 143 Pa. Superior Ct. 550, 18 A. 2d 542 (1941); American Legion Post No. 51 Appeal, 188 Pa. Superior Ct. 480, 149 A. 2d 483 (1959), affirmed 397 Pa. 430, 156 A. 2d 107 (1959), appeal dismissed 363 U.S. 720, 80 S.Ct. 1596, 4 L.Ed. 2d 1521 (1960). The Superior Court of Pennsylvania has stated that gambling has a tendency to corrupt public morals: Com. v. Lund, 142 Pa. Superior Ct. 208, 15 A. 2d 839, 845 (1940). The likelihood of "organized crime" using gambling as a profit-making activity and the dangers inherent therein have been recognized by the Federal criminal gambling laws. See Act of October 15, 1970, 84 Stat. 937, 18 U.S.C.A. §1955. Surely such considerations were in the mind of the legislature when 5512 and 5513 were enacted. Viewing these objections in light of the exceptions created, is there any rational reason for making the gambling activities of charitable organizations illegal?

Counsel for Americus failed to provide us with any cases raising an equal protection claim under a

similar factual situation and our independent search for any such cases proved to be futile. However, we did find several decisions which offer guidance. When states initially began to make exceptions to their criminal gambling laws by providing for betting on horse races at state operated or licensed tracks defendants charged with violations of the gambling statutes raised equal protection claims. See People v. Monroe, 349 Ill. 270, 182 N.E. 439 (1932); People v. Maddox, 65 Cal. App. 2d 45, 149 P. 2d 739 (1944); People v. Sullivan, 60 Cal. App. 2d 539, 141 P. 2d 230 (1943); Ratti v. Hinsdale Raceway, Inc., 109 N.H. 270, 249 A. 2d 859 (1969); and annotation at 85 A.L.R. 622. The equal protection arguments against these statutes were found to have no merit. Recognizing the violence and corruption which often accompany gambling, these courts found that state facilities could be more closely regulated than gambling at large. This close police supervision was found to provide the reasonable basis needed for the distinctions made by these statutes.

The difficulty in police supervision provided the basis for a classification made in the Maryland gambling law: Maryland Code 1957, art. 27, §246A, as added by Acts 1958, ch. 18, made it ". . . unlawful for any person . . . to bet, wage or gamble . . . upon any vessel upon any of the waters within the State of Maryland, or upon any pier, wharf, building or other structure . . . which is built upon or over any of the waters of this State and which pier, wharf, building or other structure cannot be entered from the shore of the State of Maryland by a person on foot . . ."

In Miedzinski v. Landman, 218 Md. 3, 145 A. 2d

220 (1958), defendants, owners and operators of taverns and restaurants located on piers or wharves extending from the shore out into Maryland waters, contended that the limited practical and geographical impact of the statute amounted to a discrimination against them, and that the classification was so arbitrary and unreasonable as to deny them the equal protection of the law. The Court of Appeals of Maryland disagreed, stating that: "'The fact that the latter locations [piers, etc.] are more difficult to police . . . would seem to afford an adequate basis for different classification.'" Miedzinski, supra, at 224.

We believe that the rationale of the above-cited cases is applicable to the case before us. The legislature of this state has long been concerned with the problems which can accompany unregulated gambling. There is a reasonable basis, however, for the distinction made between the state's authorized forms of gambling and that sort conducted by charitable organizations. Though there is no evidence to suggest that Americus uses gambling for anything but charitable purposes, the same does not necessarily apply to all "charitable" organizations. It would be difficult, if not impossible, to determine if all "charitable" organizations were indeed being conducted for nonprofit purposes. Considering the number of such organizations presently existing, police supervision would be an insurmountable task. This, we believe, provides the required rational basis for Pennsylvania's distinction between gambling conducted by itself and by organizations such as the Americus. There may also be other reasons for the classification which have not come to the attention of this court. For the

above-stated reasons we find that Pennsylvania's gambling laws do not violate defendant's right to equal protection under the Fourteenth Amendment.

## IV. LEGISLATIVE INTENT

Finally, defendant asserts that the conduct alleged by the Commonwealth is not of the character, nor having the nature, of that form sought to be proscribed by the legislature in passing the criminal sections in question. This contention has been sufficiently examined in the course of our discussion of these statutes' vagueness (see I above), and there is no need for reiteration.

Although we find Pennsylvania's gambling laws to be constitutional, the determination of whether these laws in their present form are in the best interests of the public is for the state legislature. We suggest that the members of Americus and other volunteer fire companies pursue their claim in that forum.

We enter the following

## ORDER

And now, June 20, 1979, after hearing held and due consideration of the testimony taken, as well as the written and oral arguments of counsel, it is ordered and directed that defendant's motion to quash information, motion to have sections 5512 and 5513 of the Pennsylvania Crimes Code declared to be unconstitutional on their face, and motion to have sections 5512 and 5513 of the Pennsylvania Crimes Code declared to be unconstitutional as applied, all of which are contained in defendant's omnibus pretrial motion, are hereby denied.